ALAN MARIS *v.* PAMELA JO MCGRATH
(SC 16394)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

Argued February 17—officially released June 29, 2004

*James E. Mattern,* for the appellant (plaintiff).

*Jeremiah Donovan,* for the appellee (defendant).

*Opinion*

BORDEN, J. The so-called "American rule" for the award of attorney's fees to the prevailing party bars such an award "except as provided by statute or in certain defined exceptional circumstances . . . ." (Internal quotation marks omitted.) *CFM of Connecticut, Inc.* v. *Chowdhury,* 239 Conn. 375, 393, 685 A.2d 1108 (1996), overruled in part on other grounds, *State* v. *Salmon,* 250 Conn. 147, 155, 735 A.2d 333 (1999). The rule does not apply, however, where the other party or

his attorney has acted in bad faith. Id., 394. This is what is known as the bad faith exception to the American rule. Id. The principal issue in this certified appeal involves the standard governing an award of attorney's fees to the prevailing party, based upon the bad faith conduct of the other party himself in the litigation, as opposed to the conduct of that other party's attorney. The plaintiff, Alan Maris, appeals, following our grant of certification, from the judgment of the Appellate Court affirming the trial court's award of attorney's fees to the defendant, Pamela Jo McGrath.[1] The plaintiff claims that the Appellate Court applied an improper test in affirming the award of attorney's fees to the defendant, and that, under the appropriate test, no such award was warranted. We affirm the judgment of the Appellate Court.

The plaintiff brought this action against the defendant in four counts alleging: (1) breach of an oral agreement; (2) unjust enrichment;[2] (3) return of items of personalty; and (4) constructive trust.[3] The trial court, after a bench trial, rendered judgment for the defendant on the complaint. The court also awarded attorney's fees to the defendant. The plaintiff appealed from the judgment of

---

[1] We granted the plaintiff's petition for certification to appeal, limited to the following issue: "Under the circumstances of the case, did the Appellate Court properly determine that the 'American rule,' which prohibits the awarding of attorney's fees to a prevailing party except where allowed by statute or contractual provision, did not apply?" *Maris* v. *McGrath*, 254 Conn. 919, 759 A.2d 1025 (2000).

[2] The unjust enrichment claim was based on the same facts as alleged in the breach of contract claim.

[3] The defendant filed a counterclaim in six counts alleging: (1) breach of contract; (2) trespass; (3) theft of personalty; (4) unjust enrichment; (5) breach of a confidential relationship; and (6) detrimental reliance. The court found liability for the defendant under the first count, but concluded that she had not proven damages. The court also found for the plaintiff on the other five counts of the counterclaim. Accordingly, the court rendered judgment for the plaintiff on the counterclaim. That part of the trial court's judgment is not involved in this appeal.

the trial court to the Appellate Court, challenging the award of attorney's fees.[4] The Appellate Court affirmed that award. *Maris* v. *McGrath*, 58 Conn. App. 183, 191, 753 A.2d 390 (2000). This certified appeal followed.

The trial court made the following findings of fact. In September, 1985, the defendant began working as a dental assistant in the orthodontic office of the plaintiff and his partner, Kenneth Carlough. Eventually, the defendant began dating the plaintiff. In the spring of 1989, the defendant underwent a hysterectomy, and the plaintiff dated other people. In the summer of 1989, after the defendant had recovered from the operation, the plaintiff sought to resume their relationship. He told her that they would live together, travel together, and spend the rest of their lives together. By the end of that summer, they were living two weeks each month at the defendant's home and two weeks at the plaintiff's home.

The plaintiff and defendant lived in this fashion for approximately one year until, in the summer of 1990, the defendant's relationship with the plaintiff was causing a problem at work because Carlough was uncomfortable supervising a woman who was the equivalent of the wife of his partner. Thus, the defendant was required to leave a job that she enjoyed.

The plaintiff and defendant talked about her future. The plaintiff did not approve of the defendant taking a similar job in another dental office because she would not be available to accompany him on his frequent trips and vacations. They decided that she should attend hairdressing school. The plaintiff offered to set the defendant up in a business: he would own a travel agency, and she would have a hairdressing salon next

---

[4] The plaintiff also challenged the trial court's rejection of his unjust enrichment claim. The Appellate Court rejected that claim. *Maris* v. *McGrath*, 58 Conn. App. 183, 186–88, 753 A.2d 390 (2000). That issue is not involved in this appeal.

door. The plaintiff discussed this plan with his accountant. The plaintiff promised the defendant that if she would leave her employment with his dental practice, he would take care of her material wants and needs for the rest of her life.

In reliance on the plaintiff's promises, the defendant left her employment in his dental practice and, in September, 1991, began to attend hairdressing school. That education was interrupted by a serious illness in February, 1991, but following her graduation, she began to work as a hairdresser. By renting space in an established hairdressing salon, the defendant was able to take time off as required to accompany the plaintiff in his travels. By the summer of 1992, however, their relationship was ending.[5]

The trial court found that their financial arrangements were as follows. On September 8, 1989, the defendant signed the necessary documents to transform her individual credit union account into a joint account with the plaintiff. The plaintiff made a number of deposits into that account. Of the twenty-three checks deposited into the account, nineteen were made payable to the credit union, and four were made payable to the defendant. On the backs of the checks payable to the credit union, no writing appears except for a single endorsement in the plaintiff's handwriting on one of the checks. On some of the checks, the plaintiff made notations in the memorandum section, most of which were totals for his own use.

The defendant would write checks on that account to cover both her own and their joint expenses. The

---

[5] The plaintiff suggested that the reason for the termination of the relationship was the defendant's view that their arrangement should lead to marriage and the plaintiff's refusal to make such a commitment. The defendant suggested that the reason for the termination was the plaintiff's decision to spend six months each year at his villa in Mexico, and his expectation that she would await his return for the following six months each year. The court did not resolve this conflict in the testimony.

plaintiff's last check was deposited into the joint account in April, 1992. In an August 17, 1992 letter to the defendant, the plaintiff made a number of trivial arrangements of their practical affairs. In September, 1992, the defendant transformed the account back into a personal account of her own, and returned to the plaintiff the $3500 in the account that was his.

In the trial court's view, the case hinged on credibility. The court noted the plaintiff's assertions that the defendant had made an oral promise to repay the money that he was depositing into their joint account and any amounts that he spent on her house, and that she promised that she would execute a document providing that she would repay him those loan amounts from the proceeds of the house whenever she would sell it. The defendant, however, denied that the plaintiff's deposits into the account and that the amounts he spent on her house were loans. The court found, contrary to the plaintiff's testimony, that the deposits into the account were not loans, and that the defendant never made any such promises to repay the plaintiff.

Furthermore, the court specifically found that the plaintiff was untruthful in his testimony in various significant respects. This finding was based in general on the testimony of four people who, in the court's view, "have been more closely involved with [the plaintiff] than anyone," and who "know [the plaintiff] best." These people included: Peter Demas, the orthodontist with whom the plaintiff began his practice; Carlough, his partner during most of his career; Barry Stark, a dentist who was his former best friend; and the defendant. Each testified that the plaintiff's character for veracity "is miserable"; some testified that "his reputation for veracity in the community of orthodontists is miserable"; and they all shared the view that he "cannot be trusted." The court noted that the plaintiff offered no evidence contradictory to this testimony, and the

court consequently gave "great weight" to that evidence. In response to the plaintiff's claim that these witnesses were biased against him because they had been involved in financial disputes with him, the court found, to the contrary, that "they bear ill will toward [the plaintiff] because he cannot be trusted."

In addition, the trial court specifically found that the untruthfulness of the plaintiff's testimony was shown by the fact that it was self-contradictory. The court found that it was not until after the relationship had terminated that the plaintiff began to claim that all the money that he had deposited into the joint account were loans to the defendant. In addition, the August 17, 1992 letter to the defendant made no mention of any such loans.

Further, the plaintiff had testified that, other than the initial cash deposit, he had never made deposits into the joint account personally, suggesting that it was the defendant who did all of the depositing into the account. In this regard, there was a specific check, dated July 27, 1990, that had been deposited into the account; on this check, the plaintiff had written the word "loan" in the memorandum section. The check was not deposited into the account, however, until five days after it was dated, and the trial court credited the defendant's testimony that she denied seeing the word "loan" when she signed it. The court specifically found that the plaintiff wrote the word "loan" into the memorandum section of the check after the defendant had signed it but before the plaintiff himself deposited the check into the joint account. Thus, the court found that the plaintiff's "denials concerning who made the deposits into the joint account [are] clearly contradicted by his own writing at the time he had been making the deposit." In addition, the court specifically credited the testimony of the plaintiff's accountant, James Mason, who testified that the plaintiff was a compulsively meticulous record

keeper who would never have entered into a loan agreement without careful documentation. The plaintiff never produced any such documentation, however, except for the word "loan" on the check, which he had added after the check had been endorsed. Thus, the trial court specifically found that the plaintiff was "untruthful when he testified that he and [the defendant] agreed that the amounts of money that he was depositing into their joint checking account [constituted] loans and that they simply never got around to producing any written document." Instead, the court specifically found that "[n]one of [the plaintiff's] explanations for the joint account is persuasive," and that the joint account was "such as husbands and wives and men and women who are living together keep: each makes contributions to the living expenses of both, no one keeps a very close track of who is depositing and who is spending what."

The court also specifically addressed the plaintiff's credibility regarding whether he had discouraged the defendant from working in another dental office. The court noted that, contrary to the defendant's testimony that she had to leave the employment because their relationship was harming the working environment, the plaintiff had testified that he did not discourage her from leaving, and that he never even engaged in discussions about the topic. The court found, contrary to the plaintiff's testimony, however, that the defendant "had to leave employment in [the plaintiff's] office because their personal relationship was harming the work environment." The court based this finding, not only on the defendant's testimony, but on the testimony of Stark, who testified that he and the plaintiff had explicit discussions about the topic, that he was willing to offer the defendant a job in his office but that she could not work there if the plaintiff expected her to accompany him on his frequent travels, and that the plaintiff agreed

that she frequently would be absent from work when she accompanied him on those trips.

The court then turned to the specific counts of the complaint. The court noted that the first count was "based upon an alleged oral agreement that the money put into the account was a loan to be paid back upon the sale of the defendant's house." The court found "that there was no oral agreement since it does not believe the testimony of the plaintiff that there was ever a contract." With respect to the second count, based upon unjust enrichment, the court found, contrary to the plaintiff's claim and testimony, that the arrangement "was for the mutual benefit of the parties and that the defendant was not unjustly enriched. She provided [the plaintiff] with the love and affection he wanted and he provided the money." As to the third count, which was for return of items of personalty, the court found that the plaintiff had failed to meet his burden of proving who owned the items. As to the fourth count, which was for a constructive trust of the defendant's house, the court specifically did "not find the testimony of the plaintiff to be credible . . . [and did] believe the testimony of the defendant . . . ." Accordingly, the court rendered judgment for the defendant on all counts of the plaintiff's complaint.

At the end of its memorandum of decision, the trial court noted that the defendant had also claimed attorney's fees. The court specifically found that such fees "should be awarded to the defendant for defending a case which the court finds to be totally without merit." Accordingly, the court noted that it would entertain a motion to determine the amount of such fees.

Thereafter, the defendant filed her motion for attorney's fees, and the court heard oral argument and entertained briefs on the issue. The defendant filed a statement in the amount of $15,218.86, which the plain-

tiff did not dispute. The plaintiff did dispute, however, the defendant's entitlement to an award of attorney's fees. The court noted its findings that "the plaintiff's claims were totally false and that his testimony was not truthful." The court also specifically found that *"[t]his was not a matter of two good faith litigants as claimed by the plaintiff."* (Emphasis added.) Accordingly, the trial court, citing this court's decision in *CFM of Connecticut, Inc.* v. *Chowdhury,* supra, 239 Conn. 375, granted the defendant's motion for attorney's fees in the stated amount.

The Appellate Court affirmed the trial court's award of attorney's fees based on its reading of *Chowdhury.* Recognizing that *Chowdhury* held (1) that there was an exception to the American rule regarding the awarding of attorney's fees for bad faith litigation, (2) that this meant that the rejected claim had to be entirely without color, and (3) that *Chowdhury* was a case involving an award of attorney's fees based on the conduct of the attorney, rather than the client, the Appellate Court fashioned the following test, under *Chowdhury,* to measure the conduct of the party: "The test [enunciated in *Chowdhury*] can be couched in terms to measure the conduct of a party as well as an attorney. A claim is colorable, for purposes of the bad faith exception to the American rule, if a reasonable person, given his or her first hand knowledge of the underlying matter, could have concluded that the facts supporting the claim might be established." *Maris* v. *McGrath,* supra, 58 Conn. App. 189–90. Applying this standard, the Appellate Court affirmed the trial court's award of attorney's fees. Id., 191.

The plaintiff first claims that the Appellate Court employed an incorrect standard in affirming the award of attorney's fees. Specifically, the plaintiff argues that the "Appellate Court simply fashioned a new test out of whole cloth." We disagree.

In *Chowdhury*, we recognized both the American rule and the bad faith exception to the rule. We stated: "[S]ubject to certain limitations, a trial court in this state has the inherent authority to impose sanctions against an attorney and his client for a course of claimed dilatory, bad faith and harassing litigation conduct, even in the absence of a specific rule or order of the court that is claimed to have been violated. [*Fattibene* v. *Kealey*, 18 Conn. App. 344, 359–60, 558 A.2d 677 (1989)]. We also agree with the general principles stated by the Appellate Court in *Fattibene*.

"As a procedural matter, before imposing any such sanctions, the court must afford the sanctioned party or attorney a proper hearing on the . . . motion for sanctions. Id., 352. There must be fair notice and an opportunity for a hearing on the record. . . . Id., 353. This limitation, like the substantive limitations stated in the following discussion, is particularly appropriate with respect to a claim of bad faith or frivolous pleading by an attorney, which implicates his professional reputation. Id.

"As a substantive matter, [t]his state follows the general rule that, except as provided by statute or in certain defined exceptional circumstances, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser. *Alyeska Pipeline Co.* v. *Wilderness Society*, 421 U.S. 240, 247, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975); *Ernst Steel Corporation* v. *Reliance Ins. Co.*, 13 Conn. App. 253, 261, 536 A.2d 969 (1988). That rule does not apply, however, where the opposing party has acted in bad faith. *Roadway Express, Inc.* v. *Piper*, [447 U.S. 752, 765–66, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980)]. It is generally accepted that the court has the inherent authority to assess attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons. Id., 766; *Dow Chemical Pacific Ltd.* v. *Rascator Maritime*

*S.A.*, 782 F.2d 329, 344 (2d Cir. 1986). This bad faith exception applies, not only to the filing of an action, but also in the conduct of the litigation. *Roadway Express, Inc.* v. *Piper*, supra, 766, quoting *Hall* v. *Cole*, 412 U.S. 1, 15, 93 S. Ct. 1943, 36 L. Ed. 2d 702 (1973). It applies both to the party and his counsel. *Roadway Express, Inc.* v. *Piper*, supra [766]. Moreover, the trial court must make a specific finding as to whether counsel's [or a party's] conduct . . . constituted or was tantamount to bad faith, a finding that would have to precede any sanction under the court's inherent powers to impose attorney's fees for engaging in bad faith litigation practices. Id.

"We agree, furthermore, with certain principles articulated by the Second Circuit Court of Appeals in determining whether the bad faith exception applies. To ensure . . . that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes . . . and a high degree of specificity in the factual findings of [the] lower courts. . . . *Dow Chemical Pacific Ltd.* v. *Rascator Maritime S.A.*, supra, [782 F.2d 344], quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 80 (2d Cir. 1982). Whether a claim is colorable, for purposes of the bad-faith exception, is a matter of whether a reasonable attorney could have concluded that facts supporting the claim *might be established,* not whether such facts *had been established.* . . . *Dow Chemical Pacific Ltd.* v. *Rascator Maritime S.A.*, supra, 344, quoting *Nemeroff* v. *Abelson*, 620 F.2d 339, 348 (2d Cir. 1980). To determine whether the bad faith exception applies, the court must assess whether there has been substantive bad faith as exhibited by, for example, a party's

use of oppressive tactics or its wilful violations of court orders; [t]he appropriate focus for the court . . . is the conduct of the party in instigating or maintaining the litigation. *Dow Chemical Pacific Ltd.* v. *Rascator Maritime S.A.*, supra, 345. Cf. *Eastway Const. Corp.* v. *City of New York*, 762 F.2d 243, 253 (2d Cir. 1985) (F. R. Civ. P. 11 has more expansive standard for imposition of sanctions than court's inherent powers). . . . *Fattibene* v. *Kealey*, supra, 18 Conn. App. 360–61." (Emphasis in original; internal quotation marks omitted.) *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 393–95.

As *Chowdhury* itself recognizes, both the procedural and substantive standards we articulated therein apply to both the attorney and his client. Throughout, we used language indicating this dual application. See id., 393 ("court . . . has the inherent authority to impose sanctions against an attorney and his client" [internal quotation marks omitted]); id. (before imposing sanctions court must afford hearing to "the sanctioned party or attorney"); id., 394 (bad faith exception to American rule "applies both to the party and his counsel" [internal quotation marks omitted]). Because the sanctions in *Chowdhury* were imposed against the attorney, however, we, of necessity, stated the standard for colorability in those terms: "Whether a claim is colorable, for purposes of the bad-faith exception, is a matter of whether a reasonable attorney could have concluded that facts supporting the claim *might be established,* not whether such facts *had been established.* . . . *Dow Chemical Pacific Ltd.* v. *Rascator Maritime S.A.*, supra, [782 F.2d 344], quoting *Nemeroff* v. *Abelson,* [supra, 620 F.2d 348]." (Emphasis in original; internal quotation marks omitted.) *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 394–95.

We then went on, however, to elaborate on the substantive standard to be applied in measuring the bad

faith exception in terms that applied to both attorneys and their clients. "To determine whether the bad faith exception applies, the court must assess whether there has been substantive bad faith as exhibited by, for example, a party's use of oppressive tactics or its wilful violations of court orders; [t]he appropriate focus for the court . . . is the conduct of the party in instigating or maintaining the litigation." (Internal quotation marks omitted.) Id., 395.

The present case, by contrast, involves sanctions in the form of attorney's fees for bad faith conduct by a party, not by the attorney. To the extent that part of the general standard articulated in *Chowdhury* was cast in terms that apply particularly to the attorney in a case, it is necessary, therefore, to recast that part of the standard in terms that apply particularly to the client. We agree with the Appellate Court's formulation in this regard. As applied to a party, rather than to his attorney, a "claim is colorable, for purposes of the bad faith exception to the American rule, if a reasonable person, given his or her first hand knowledge of the underlying matter, could have concluded that the facts supporting the claim might have been established." *Maris* v. *McGrath*, supra, 58 Conn. App. 189–90.

This is an appropriate reformulation of the standard, cast in terms applicable to a party, because it focuses on the party's firsthand knowledge of the facts and whether, given that knowledge, the party reasonably could have concluded that his or her claim might be established. This standard, moreover, takes into account the capacity of the party for truthfully or untruthfully recounting those facts, as well as the capacity for honest mistakes, recollections and disagreements over those facts. Furthermore, in applying this standard to a party's conduct in maintaining the litigation in question, the court must bear in mind the other substantive standards articulated in *Chowdhury*. Thus,

the court must take into account whether the party acted in good or bad faith. *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 395. Finally, as we stated in *Chowdhury*, there must be clear evidence that the party's conduct was entirely without color, and there must be a high degree of specificity in the factual findings of the trial court. Id., 394.

Applying this standard to the present case, we conclude that the trial court was justified in making the award of attorney's fees. First, the court specifically found that the plaintiff repeatedly had testified untruthfully and in bad faith. The court specifically identified all of the numerous instances in which the plaintiff had testified untruthfully, and it specifically found that the plaintiff's claims were "wholly without merit," "totally false," that "his testimony was not truthful," and that "this was not a matter of two good faith litigants . . . ." Second, the matters about which the plaintiff repeatedly had testified untruthfully and in bad faith were matters particularly within his firsthand knowledge, namely, conversations between him and the defendant, and financial arrangements and transactions between them. Third, all of these bad faith untruths involved, not peripheral or collateral matters, but matters that went to the heart of the plaintiff's claims against the defendant. Finally, our review of the entire record convinces us that these findings were based on ample and clear evidence, which the trial court specifically identified in its *memorandum of decision.*

We reject, therefore, the plaintiff's general claim that this standard "is unworkable," and "will [e]nsure that a prevailing party's version of the facts is akin to firsthand knowledge of the underlying matter," and that, under it, the prevailing party would always be entitled to attorney's fees because "the losing party could not have prevailed given the facts proved." The standard we have adopted is sufficiently demanding that it will not inhibit

good faith litigants from presenting their claims honestly, and we are confident that our trial courts will apply it with appropriate recognition of its demanding nature.

We also reject the plaintiff's more specific claim that his unjust enrichment claim was colorable because the trial court found that the financial arrangement benefited both parties, and because the trial court did not find that the plaintiff had not made out a prima facie case of unjust enrichment. Although it is true that the trial court, in finding for the defendant on the plaintiff's second count of the complaint, which was based on the legal theory of unjust enrichment, found that the arrangement benefited both parties, and it is also true that the court did not dismiss that count for failure to make out a prima facie case,[6] that does not mean, as the plaintiff suggests, that the trial court's award of attorney's fees cannot stand.

As we have noted, the unjust enrichment count was based on the same allegations as were contained in the first count of the complaint, which was based on the legal theory of breach of an alleged oral agreement by the defendant that the moneys the plaintiff had deposited into their joint account constituted a loan by the plaintiff to the defendant, to be repaid to the plaintiff when and if the defendant sold her house. The trial court specifically found that it did "not believe the testimony of the plaintiff that there was ever a contract." In this respect, the court also specifically found that

---

[6] We note, however, that the trial court was not called upon to make such a determination because the defendant did not move for judgment of dismissal. Contrary to the plaintiff's suggestion, however, this does not establish that the claim was colorable, because, the plaintiff having testified—albeit untruthfully—to the facts establishing his alleged cause of action, the defendant was justified in not filing such a motion. See *Grondin* v. *Curi*, 262 Conn. 637, 647–48 n.12, 817 A.2d 61 (2003) (motion for judgment of dismissal not to be granted if evidence, if credited, would make out prima facie case).

the plaintiff had testified untruthfully about the frequency and nature of his deposits to the account, and about the general nature of the joint account as between the parties. Thus, as to both the first and second counts of the complaint, the trial court specifically found that the facts testified to by the plaintiff were untrue, and these findings must be read in conjunction with the court's repeated findings throughout its decision about the plaintiff's untruthfulness, lack of credibility and bad faith.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.