******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BETH KELLER *v.* RICHARD KELLER
(AC 37263)
(AC 37560)

Beach, Mullins and Mihalakos, Js.

*Argued May 10—officially released July 26, 2016*

(Appeal from Superior Court, judicial district of
Middlesex, Adelman, J.)

*Karen L. Dowd*, with whom was *Brendon P. Levesque*, for the appellant (plaintiff).

*Steven R. Dembo*, with whom were *Caitlin E. Kozloski* and, on the brief, *P. Jo Anne Burgh*, for the appellee (defendant).

*Opinion*

MIHALAKOS, J. The plaintiff, Beth Keller, appeals from the judgment of the trial court dissolving her marriage to the defendant, Richard Keller, and entering related financial orders. On appeal, the plaintiff claims that the trial court improperly (1) relied on gross income in making its financial orders, (2) concluded that the plaintiff had engaged in litigation misconduct and bad faith litigation, and (3) imputed income of $72,000 to the plaintiff. The plaintiff also claims that the totality of the trial court's orders constituted an abuse of discretion. We affirm the judgment of the trial court.

We first set forth the following relevant facts and procedural history. The parties married on August 15, 1992, and the plaintiff brought this dissolution action in May, 2011. The trial court issued pendente lite orders in early August, 2011, which were appealed to this court. We reversed the judgment and remanded the case for further proceedings. See *Keller* v. *Keller*, 141 Conn. App. 681, 685, 64 A.3d 776 (2013). The court held hearings on remand and issued new pendente lite orders in an August 6, 2013 memorandum of decision. This decision was then the subject of a second appeal. Following the defendant's motions for articulation and review and pursuant to an order of this court, the trial court issued an articulation of its August 6, 2013 decision on January 29, 2014. It subsequently dissolved the parties' marriage and issued final orders on July 9, 2014. We then dismissed the appeal of the August 6, 2013 judgment as moot.

In its July 9, 2014 memorandum of decision, the trial court found the following relevant facts.[1] The parties were married on August 15, 1992, and during the course of their marriage had three children. As of July 9, 2014, the children were eighteen, fifteen, and twelve.

The plaintiff obtained a master's degree in clinical nutrition from Boston University and worked in public relations doing food and nutrition marketing. She had only worked outside the home in a limited capacity between the births of the parties' first and second children, and after the birth of their second child did not work outside of the home for the fourteen years prior to filing for dissolution. Her recent attempts to find meaningful employment have met with limited success. At the time of the July 9, 2014 memorandum of decision she was earning $500 per month, and the court determined that she had an earning capacity of $26,000 per year.

The defendant was educated as a lawyer and spent most of his adult career in finance. Up to the end of 2010, he was the owner of Angler, a hedge fund that he started in 2006, which, at its peak, had between 50 and 100 investors and managed up to $150 million in assets. The fund crashed in the fall of 2008 and finally

was closed out effective December 31, 2010. He lost a substantial part of the family's wealth along with that of his investors. The defendant, in an attempt to develop investment opportunities, has continued to maintain the lifestyle of a successful hedge fund manager despite his very limited income and resources. The court heard varied expert opinions regarding his likelihood of success, with the plaintiff's expert predicting that he had an earning capacity between $800,000 and $1.5 million per year, and the defendant's expert predicting that his likely employment would be as an investment analyst making between $60,000 and $175,000 per year. The court determined that he had an earning capacity of $175,000, but also noted that his finances could improve dramatically over time.

Both parties had received significant amounts of money, primarily from their parents, which they classified as loans. They used this money to fund this litigation and to fund their lifestyles. The trial court determined the plaintiff had received $30,000 per month from her parents, and imputed $78,000 of it per year as income. The defendant owed $651,498 to his parents, but the court did not impute any income based on this amount.

The court entered the following relevant financial orders on July 9, 2014. It ordered the defendant to pay the plaintiff as periodic alimony the sum of $3000 per month. It ordered that the plaintiff transfer her interest in the family home, the present equity value being approximately $1,139,000, to the defendant via quitclaim deed, and that the defendant pay the plaintiff $225,000. It ordered that the defendant pay the plaintiff 90 percent of any money paid to him from an undistributed "carried interest" account with Sandler Entities (Sandler), a New York investment firm for which he previously had worked, the remaining balance of which was $639,200.[2] Having awarded custody of the children to the defendant and having found that the parties exceeded the maximum combined net weekly income under the child support guidelines, the court declined to order the plaintiff to pay child support. Finally, it ordered "that the plaintiff shall pay to the defendant the sum of $25,000 toward his legal fees expended in work done regarding her litigation misconduct . . . ." This appeal followed. Additional facts will be set forth as necessary.

We first set forth our standard of review. "We will not reverse a trial court's rulings regarding financial orders unless the court incorrectly applied the law or could not reasonably have concluded as it did. . . . A fundamental principle in dissolution actions is that a trial court may exercise broad discretion in awarding alimony and dividing property as long as it considers all relevant statutory criteria. . . . In reviewing the trial court's decision under [an abuse of discretion] standard, we are cognizant that [t]he issues involving

financial orders are entirely interwoven. The rendering of judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other. . . .

"A reviewing court must indulge every reasonable presumption in favor of the correctness of the trial court's action to determine ultimately whether the court could reasonably conclude as it did. . . . This standard of review reflects the sound policy that the trial court has the opportunity to view the parties first hand and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, in which such personal factors . . . as the demeanor and the attitude of the parties are so significant." (Internal quotation marks omitted.) *Cimino* v. *Cimino*, 155 Conn. App. 298, 302–303, 109 A.3d 546, cert. denied, 316 Conn. 912, 111 A.3d 886 (2015).

I

The plaintiff claims that the court improperly relied on gross income rather than net income in making its financial orders. She asserts that because the court found that the plaintiff had a yearly gross income of $78,000 and the defendant had a yearly gross income of $175,000, it clearly based its financial orders on gross income. The defendant replies that the court specifically referenced net income when applying the child support guidelines, had information from which it could calculate net income, and was otherwise silent regarding whether it was using gross or net income. The defendant urges us to conclude that the court properly used net income. We agree with the defendant.

"It is well settled that a court must base child support and alimony orders on the available net income of the parties, not gross income." *Morris* v. *Morris*, 262 Conn. 299, 306, 811 A.2d 1283 (2003). Where "the trial court expressly and affirmatively state[s] that it relied on gross income in determining the defendant's support obligation, the trial court abuse[s] its discretion because it applied the wrong legal standard." Id., 307. On the other hand, where the trial court states that it is relying on "all of the relevant information, including the parties' financial affidavits and their child support guideline worksheets, both of which [include] the parties' net incomes, as well as the testimony of the parties"; (internal quotation marks omitted) *Kelman* v. *Kelman*, 86 Conn. App. 120, 123–24, 860 A.2d 292 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1079 (2005); we may conclude that the trial court properly used net income. This may be true even if an order "is expressed as a function of the parties' gross earnings." *Hughes* v. *Hughes*, 95 Conn. App. 200, 207, 895 A.2d 274, cert. denied, 280 Conn. 902, 907 A.2d 90 (2006). "[W]e differentiate between an order that is a function of gross income and one that is based on gross income. . . . [T]he term 'based' as used in this context connotes an

order that only takes into consideration the parties' gross income and not the parties' net income. Consequently, an order that takes cognizance of the parties' disposable incomes may be proper even if it is expressed as a function of the parties' gross earnings." Id. In short, although "[i]t is well settled that a court must base its child support and alimony orders on the available net income of the parties, not gross income . . . [w]hether or not an order falls within this prescription must be analyzed on a case-by-case basis. Thus, while our decisional law in this regard consistently affirms the basic tenet that support and alimony orders must be based on net income, the proper application of this principle is context specific." (Internal quotation marks omitted.) *Cleary* v. *Cleary*, 103 Conn. App. 798, 801, 930 A.2d 811 (2007).

In the July 9, 2014 memorandum of decision, the court found the plaintiff's earning capacity to be $26,000 gross per year, plus reoccurring gifts in the amount of $72,000 gross per year for an effective income of $98,000 annually, and the defendant's earning capacity to be $175,000 gross per year. When calculating child support, it stated that "the combined estimated *net weekly income* of the parties would exceed the four thousand dollar ($4000) maximum . . . ." (Emphasis added.) It then stated that it was entering its orders "in consideration of the findings of fact enumerated above and in consideration of the criteria as set forth in General Statutes §§ 46b-56, 46b-56a, 46b-56c, 46b-62, 46b-81, and 46b-82 as explained by our case law . . . ." The court ordered the defendant to pay the plaintiff alimony in the amount of $3000 per month, without stating how it had arrived at this amount. The parties also filed child support guideline worksheets and financial affidavits, although as stated previously the court relied on earning capacity and imputed income for each party.

The court did not state how it used its gross income findings in entering its orders. It did state that it was fashioning an award as equitably as possible given the constraints of incomplete information. See *Commissioner of Transportation* v. *Larobina*, 92 Conn. App. 15, 32, 882 A.2d 1265, cert. denied, 276 Conn. 931, 889 A.2d 816 (2005). Also of note, in the articulation of its August 6, 2013 memorandum of decision, the court articulated the method it used to arrive at the child support guidelines amounts in its August 6, 2013 memorandum of decision: "Using . . . gross amounts, the court took the appropriate deductions to reach a guideline net amount for the calculation." We have no reason to conclude that the court did not perform the same analysis for its July 9, 2014 judgment.[3]

In short, the child support calculation clearly states that it is based on net income, and the alimony award does not state whether it is based on any income finding. The court stated that it relied on case law which clearly

requires that net income be used, and it had demonstrated in an earlier articulation that it understood how to calculate net income as a function of gross income. We therefore conclude that the court used the proper standard. See *National City Real Estate Services, LLC* v. *Tuttle*, 155 Conn. App. 290, 298, 109 A.3d 932 (2015) (absent evidence to contrary, we assume that court acted properly).

## II

The plaintiff claims that the court erred in finding that she engaged in litigation misconduct. She asserts that the court confused litigation misconduct and bad faith litigation, and moreover that the evidence does not show that she acted in bad faith and without any colorable claim. The defendant responds that the court utilized the proper standard and properly found that the plaintiff was required to pay his attorney's fees for her actions during the course of the litigation. We agree that the court's analysis blends litigation misconduct and bad faith litigation when they are in fact discrete doctrines, but we conclude that the court nonetheless applied the proper standard, and we affirm its findings.

Litigation misconduct may be sanctioned at the discretion of the court under *Ramin* v. *Ramin*, 281 Conn. 324, 353, 915 A.2d 790 (2007), where a party has engaged in egregious litigation misconduct. Our Supreme Court clarified in *Berzins* v. *Berzins*, 306 Conn. 651, 658, 51 A.3d 941 (2012), that *Ramin* was applicable only to discovery misconduct. It then considered whether the trial court "could have acted within its inherent authority to impose sanctions against a litigant for filing frivolous and duplicative postjudgment motions." Id., 660. It ruled that the court could do so under the bad faith exception to the American rule if it made "the required, two part finding pursuant to *Maris* v. *McGrath*, [269 Conn. 834, 844, 850 A.2d 133 (2004)]—namely, that the [litigant's] claims were entirely without color and that the [litigant] acted in bad faith . . . ." *Berzins* v. *Berzins*, supra, 660. In the present case, the trial court blended the *Ramin* and *Maris* standards in that it referred to litigation misconduct under *Ramin* as the " 'bad faith exception to the American Rule' " and stated that *Berzins* demonstrated that "litigation misconduct in dissolution matters was not limited to discovery misconduct," whereas *Berzins* in fact demonstrated that litigation misconduct was so limited, but held that in the alternative courts could use their inherent power pursuant to the bad faith exception to sanction other conduct provided they made the more stringent findings required by *Maris*. The court in the present case went on, however, to correctly quote and apply the two part test for the bad faith exception as quoted in *Maris* and *Berzins*. The court therefore applied the correct legal standard.

The following additional facts are necessary to deter-

mine whether the court abused its discretion by ordering the plaintiff to pay attorney's fees under the bad faith exception. The court found that the plaintiff had been in contempt of court for multiple incidents.[4] It found that she had violated its order that the defendant would have exclusive use of the marital home when she entered and stole his garbage. It also found her in contempt for making changes to her Facebook account after the court had ordered her to preserve information in social media websites and for portraying the defendant in a negative light in the eyes of the children and others. Finally, it found her in contempt for failing to supply her iPhone password after being ordered to do so on multiple occasions.

In claiming that the court abused its discretion in awarding attorney's fees, the plaintiff focuses on what the trial court terms the "damaging materials allegedly belonging to the defendant" that the plaintiff initially claimed to have found in 2006, but later claimed to have stolen from the defendant's garage in 2013. The plaintiff asserts that these materials were pornographic in nature and that she had disclosed them during a confidential mediation session. She maintains that the defendant's counsel then made the materials the centerpiece of the case, seeking extensive discovery in order to prove that the plaintiff had manufactured them. She contends that she should not be blamed for the defendant's tactical decision to make this issue a part of the litigation. The attorney for the minor children confirmed that the plaintiff had never asserted that the materials were relevant to the custody issues, and the trial court stated that "it was not possible to make any clear determination as to whether or not the material came from the defendant's computer hard drive or was fabricated by the plaintiff in an attempt to gain an advantage in the case."

An award of attorney's fees, including for bad faith, is reviewed for abuse of discretion. See *Richter* v. *Richter*, 137 Conn. App. 231, 235, 48 A.3d 686, cert. denied, 307 Conn. 926, 55 A.3d 568 (2012). "To determine whether the bad faith exception applies, the court must assess whether there has been substantive bad faith as exhibited by, for example, a party's use of oppressive tactics or its wilful violations of court orders; [t]he appropriate focus for the court . . . is the conduct of the party in instigating or maintaining the litigation." (Internal quotation marks omitted.) *Maris* v. *McGrath*, supra, 269 Conn. 845–46. The court must also determine whether the claim is colorable; if the claimant is a party to the litigation, "a claim is colorable, for purposes of the bad faith exception to the American rule, if a reasonable person, given his or her first hand knowledge of the underlying matter, could have concluded that the facts supporting the claim might have been established." (Internal quotation marks omitted.) Id., 847. Finally, the court must set forth its factual findings

with specificity. See *Kupersmith* v. *Kupersmith*, 146 Conn. App. 79, 97–98, 78 A.3d 860 (2013).

We first note that the court based its determination of bad faith in part on its finding that the plaintiff had committed numerous wilful violations of court orders, a finding that the plaintiff has not attacked.[5] The plaintiff makes two assertions regarding the pornographic materials, namely, that it was never proven that she manufactured them and that the defendant chose to engage in extensive discovery regarding them. Neither argument is availing. The court clearly stated that even if the plaintiff's claims were true, no reasonable person would find that her actions were justified. Even under the plaintiff's version of events, she stole the materials while under a court order not to enter the house, and she lied under oath about when she obtained them. The plaintiff has not provided any justification for presenting the materials to the defendant, and we see no reason to disturb the court's finding that there was none.

The plaintiff also claims that it was the defendant's choice to make the pornographic materials a significant part of the litigation. The trial court, however, cognizant of the circumstances of the case and the acrimonious nature of the parties' relationship, did not fault the defendant for attempting to demonstrate the provenance of the images. We see no reason to conclude that this determination was in error.

Furthermore, both the plaintiff and her attorney acknowledged her fault. Her attorney stated that the plaintiff's actions regarding the pornographic materials "blew up into a firestorm that wasted a lot of time and resources" and the plaintiff herself stated: "I feel badly because [lying about when she found the pornographic materials] caused three months of chaos for everybody."

The plaintiff has not claimed that she failed to receive notice of the possibility she could be required to pay the defendant's attorney's fees, or that the trial court failed to make sufficiently detailed findings to justify its award. See *Maris* v. *McGrath*, supra, 269 Conn. 844. Having reviewed the record, we conclude that she did have notice and the court's findings that she acted in bad faith and without colorable claims were sufficiently detailed.

On the basis of all of the foregoing, we conclude that the court did not abuse its discretion in awarding the defendant attorney's fees under the bad faith exception to the American rule.

### III

The plaintiff claims that the court improperly imputed income to her based on payments by her parents that she asserts were loans. She argues that the court found that she would repay her parents if she could, therefore

it found her credible and should have construed the payments as loans. She further argues that the court created her inability to pay by its financial orders because it did not award her sufficient resources to pay, and, therefore, she should not be penalized. The defendant replies that the court properly imputed income to the plaintiff. We agree with the defendant.

Whether money should be characterized as income or a loan is a question of fact for the trial court. See *Zahringer* v. *Zahringer*, 262 Conn. 360, 369–71, 815 A.2d 75 (2003); *Zahringer* v. *Zahringer*, 124 Conn. App. 672, 679–80, 6 A.3d 141 (2010). This is often a matter that turns on the credibility of the parties and whether any documentation of the loans was provided. Compare *Zahringer* v. *Zahringer*, supra, 124 Conn. App. 678–79 (court, after determining that parties, including father's accountant, were credible and that documentation had been created, held that payments were loans), with *Desai* v. *Desai*, 119 Conn. App. 224, 236–37, 987 A.2d 362 (2010) (court, after determining that parties were not credible and that documentation was lacking, held that payments were not loans).

In the present case, the court found that the payments from the plaintiff's parents initially may have been made with the intention that they would be repaid, but that this changed over time into outright support payments. It also found that the plaintiff acknowledged that some payments were not loans, and that she was unsure whether others were loans. The plaintiff claims that by stating that the plaintiff would repay the money if she could, the court was finding credible her contention that the payments were loans. We disagree with the plaintiff's conclusion. When the court determined that the payments were not loans, it considered the actual situation faced by the plaintiff, in which she was unlikely to be able to repay the money, and therefore concluded that the payments were gifts because they were made without likelihood of repayment. Whether, in a theoretical situation, the plaintiff would repay these gifts does not contradict this assessment. The court's statement that the plaintiff would repay if she could is not contradictory to its holding that, given the plaintiff's current situation, the payments were not loans.

The plaintiff also claims that the court created a situation where she could not repay the alleged loans because it divided the assets as it did and permitted the defendant to use two prior Sandler distributions to repay his own loans. We are not persuaded.

The defendant had received two earlier distributions from Sandler in the combined amount of $1,271,300, which he used to repay loans from his parents. The court did not fault him for this action, or order that he provide equalization payments to the plaintiff. We will return to the question of whether this division of assets constituted an abuse of discretion in part IV of this

opinion. Regarding how the Sandler distribution affects whether the court abused its discretion in treating the money received by the plaintiff as income, the plaintiff has not pointed to any testimony that her parents were expecting payment from the Sandler distribution or other assets when they made the payments. The court based its determination on the plaintiff's testimony, spending habits, and financial situation. We conclude, therefore, that the court did not abuse its discretion in making this determination.

IV

The plaintiff claims that the totality of the court's orders constituted an abuse of discretion. She points to the court's disparate treatment of family loans to each party, the defendant's use of marital assets to pay his loans, the court's disparate treatment of the parties' potential bankruptcies, the court's disparate treatment of the parties' conduct, and the overall financial orders being grossly inequitable. The defendant responds that all of these orders were proper exercises of the trial court's discretion. We agree with the defendant.

"The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage." *Pasquariello* v. *Pasquariello*, 168 Conn. 579, 585, 362 A.2d 835 (1975). "[A] fundamental principle in dissolution actions is that a trial court may exercise broad discretion in . . . dividing property as long as it considers all relevant statutory criteria." (Internal quotation marks omitted.) *Coleman* v. *Coleman*, 151 Conn. App. 613, 617, 95 A.3d 569 (2014). "It is well settled that [i]n dissolution proceedings, the court must fashion its financial orders in accordance with the criteria set forth in General Statutes §§ 46b-81 (division of marital property), 46b-82 (alimony) and 46b-84 (child support). All three statutory provisions require consideration of the parties' amount and sources of income in determining the appropriate division of property and size of any child support or alimony award. . . . We note also that [t]he trial court may place varying degrees of importance on each criterion according to the factual circumstances of each case. . . . There is no additional requirement that the court specifically state how it weighed the statutory criteria or explain in detail the importance assigned to each statutory factor." (Citations omitted; internal quotation marks omitted.) *Kaczynski* v. *Kaczynski*, 124 Conn. App. 204, 210–11, 3 A.3d 1034 (2010). "[Section] 46b–81 (c) directs the court to consider numerous separately listed criteria. No language of presumption is contained in the statute. Indeed, § 46b-81 (a) permits the farthest reaches from an equal division as is possible, allowing the court to assign to either the husband or wife all or any part of the estate of the other. . . . On the basis of the plain language of § 46b-81, there is no presumption in Con-

necticut that marital property should be divided equally prior to applying the statutory criteria." (Internal quotation marks omitted.) Id., 213. "[T]he specified criteria are not exhaustive, and the court properly may consider other equitable factors when crafting its property distribution and alimony orders." *Loughlin* v. *Loughlin*, 93 Conn. App. 618, 625, 889 A.2d 902, aff'd, 280 Conn. 632, 910 A.2d 963 (2006).

We already have touched on the court's characterization of payments made to the parties by their families. The court did not state why it considered the money provided to the defendant by his parents to be loans rather than income. As we stated previously in this opinion, this was a question of the parties' credibility and the court's consideration of the overall situation. The defendant had received loans from nonfamily members and had paid back some of the loans using the Sandler distribution. In addition, given his former position as a hedge fund manager, repayment was likely a more reasonable prospect. Any of these reasons could account for the court's disparate treatment of the payments made to the parties.[6]

The court also did not state why it permitted the defendant to use a portion of the Sandler distribution for his own purposes. Doing so amounted to distribution of an asset, which is left to the court's discretion. See *Coleman* v. *Coleman*, supra, 151 Conn. App. 617–18. The Sandler distribution amounts to compensation for the defendant's former employment, and we previously have stated that there is no presumption that assets should be distributed equally. See *Kaczynski* v. *Kaczynski*, supra, 124 Conn. App. 213. The court therefore was within its discretion to choose not to order any equalization payment to the plaintiff.

The court made passing reference to whether bankruptcy was a viable option for either party. It noted that many of the plaintiff's loans were dischargeable in bankruptcy, but that if the defendant declared bankruptcy he would not be able to work as a hedge fund manager again. The plaintiff claims that this was an improper conclusion to draw, citing to the many negative consequences that could befall her if she declared bankruptcy, such as damage to her credit rating, thereby impairing her ability to obtain a mortgage on a home. Although this may be true, we do not interpret the court's mention of bankruptcy as anything other than a passing reference. The court did not order the plaintiff to declare bankruptcy, and did not hold that it distributed assets in the manner it did because of the possibility of bankruptcy. Without further insight into the reason why the court referenced bankruptcy, by way of articulation, we are left to conclude that the court properly exercised its discretion.

The plaintiff also argues that although she was sanctioned for her actions, the court took a blind eye to

the defendant's misdeeds, which included recording the plaintiff and their children and installing spyware on the plaintiff's computer. The court addressed the defendant's conduct in its July 9, 2014 memorandum of decision: "The defendant is certainly not without fault for poor judgment during this case. The testimony was clear that early on he recorded conversations of his wife and children on a fairly routine basis, mostly without their knowledge. Prior to the commencement of the case, he had installed software capable of allowing him to monitor use of the family computer—so-called 'spyware'—without either his wife or his children knowing about his actions. He also confiscated one of his daughter's cell phones to have it forensically examined. The difference between such behavior and that of the plaintiff is that the defendant seems to have learned from his mistakes while the plaintiff did not. His poor judgment calls were, for the most part, early in the dispute and they stopped; hers continued until very shortly before the trial." The plaintiff contends that certain conduct had not stopped, in that the defendant had not removed the spyware and the defendant testified that he had stopped taping the plaintiff " 'except in particular circumstances.' " Determining what actions to sanction is within the trial court's discretion. Moreover, the defendant's actions were not taken in violation of court orders, whereas the plaintiff's were, and the court made no finding and there is no evidence in the record that the defendant's actions caused significant litigation expenses, whereas the court found that the plaintiff's actions did cause significant expenses. The court, therefore, was within its discretion to distinguish between the parties' actions in this manner.

Finally, the plaintiff claims that the financial orders were grossly inequitable. In *Casey* v. *Casey*, 82 Conn. App. 378, 385, 844 A.2d 250 (2004), this court reversed financial orders that left the defendant "saddled with a sizeable mortgage debt, when the proceeds of the increased debt inured almost exclusively to the plaintiff's benefit and when the plaintiff was awarded the property that enjoyed an appreciation in value and net equity as a result of the mortgage debt." In *Greco* v. *Greco*, 275 Conn. 348, 361, 880 A.2d 872 (2005), our Supreme Court reversed financial orders that resulted in an income deficit following payment of alimony and insurance premiums. In contrast, here the plaintiff is not saddled with any debt by the court, and she has not been ordered to pay anything by the court. She will receive a payment of $225,000 from the defendant, will receive $3000 a month in alimony, and will obtain 90 percent of the remaining $639,200 Sandler distribution if Sandler chooses to make the distribution. She claims that this will be inadequate to pay her debts and expenses. These are debts and expenses of her own making, and the defendant has similar debts and expenses that his portion of the assets, even including

the equity in the home and the Sandler distribution that he already used to pay down his debts somewhat, will not cover. As the trial court stated, "both parties have, to a very great extent, continued to live their lives over the last three years of litigation as if nothing has happened financially. The court can only deal with what it has been given and that is the reality of this case; it will be up to the parties to make their respective futures work."

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The trial court had incorporated into its July 9, 2014 memorandum of decision certain findings it had made in its August 6, 2013 memorandum of decision regarding pendente lite orders. We therefore include facts found in both memoranda.

[2] As we will discuss in this opinion, the defendant had already received distributions from Sandler during the pendency of the divorce action, which he used for his own benefit.

[3] The plaintiff also claims that the court's calculations do not work using net income and the child support guidelines worksheets provided by the parties. The plaintiff first raises this claim in her reply brief, therefore the defendant was unable to reply to this argument aside from briefly touching on it at oral argument before this court. As both this court and our Supreme Court have stated, "we do not address claims raised for the first time in a party's reply brief." *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87 n.29, 942 A.2d 345 (2008).

[4] The court summarized the plaintiff's violations as follows: "[L]eaving the jurisdiction to avoid service; multiple violations of the exclusive possession order to which she had agreed; taking personal items from the marital home; stealing the defendant's garbage from the marital home [while] searching for potential evidence to use against her husband; stealing a computer hard drive used by the defendant from the marital home; copying the data on that hard drive and showing it to others even though some of that material was clearly covered by prior court orders . . . regarding confidentiality because it included information about the defendant's former investors and other restricted information relating to the defendant's prior financial work; accessing without permission e-mail accounts of the defendant; accessing without permission various other online accounts of the defendant; and not complying in a timely fashion with the court's order directing the plaintiff to turn over to a marshal certain electronic devices."

[5] The court also discussed the significant expenditure of time and money as a result of the plaintiff's allegations that the defendant was hiding money in offshore accounts. After extensive discovery, with which the discovery special master found that the defendant fully complied, no "evidence to support the allegations originally made by the plaintiff was ever provided to the court." It is not clear from the court's memorandum whether the plaintiff's investigation into possible offshore accounts held by the defendant was an additional basis for its finding of bad faith.

[6] Both parties provided documentation of their respective loans. The defendant maintains that the plaintiff's documentation was suspect and incomplete. The court did not make a finding as to the authenticity of either parties' documentation or otherwise consider it in its analysis; therefore, we likewise do not consider the documentation in our analysis.