******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STAMFORD HOSPITAL *v.* CHAIM SCHWARTZ ET AL.
## (AC 40870)

Lavine, Prescott and Elgo, Js.

### *Syllabus*

The plaintiff hospital brought an action, pursuant to statute (§ 46b-37 [b]), against the defendants, seeking to collect a debt for medical services that it had rendered to their minor child. The defendants each filed an amended answer denying the material allegations of the plaintiff's complaint, including that they were the child's parents, and pleaded fourteen special defenses, including accord and satisfaction. The matter was referred for trial to an attorney trial referee, who recommended judgment in favor of the plaintiff. In his memorandum of decision, the referee made extensive findings of fact, on the basis of which he concluded that the plaintiff had established that, under § 46b-37 (b), there was no legitimate basis for the defendants' failure to pay the moneys that they owed to the plaintiff for the medical services rendered to the child and that he was strained to accept any testimony from the defendants as truthful. With respect to the defendants' special defenses, the referee found them to be disingenuous and that the defendants had failed to establish the requirements of accord and satisfaction under the applicable statute (§ 42a-3-311). After the defendants filed an objection to the referee's memorandum of decision, the trial court held a hearing and, thereafter, rendered judgment in favor of the plaintiff. Subsequently, the plaintiff filed motions for a special finding of bad faith and for attorney's fees. In response, the court issued an order stating that it had found bad faith as a matter of law in its ruling regarding the special defense of accord and satisfaction and remanded the case to the referee for a finding of whether any other acts of the defendants were made in bad faith. The referee subsequently filed a supplemental memorandum of decision in which he found that all of the defendants' special defenses were pleaded and pursued in bad faith and that the defendants had used the judicial system as a means to avoid or delay paying their financial obligation to the plaintiff. After the defendants filed an objection to the referee's supplemental memorandum of decision, the trial court concluded with respect to the plaintiff's motion for a special finding of bad faith that the defendants' lack of credibility permeated the entire proceeding and that they acted in bad faith as to their special defenses. The court then granted the plaintiff's motion for attorney's fees on the basis of its finding of bad faith and awarded the plaintiff the full amount that it had requested. On the defendants' appeal to this court, *held* that the defendants could not prevail on any of their twenty-three claims on appeal, as none of those claims was meritorious, the record supported the findings of the referee and the trial court that the defendants acted in bad faith, and the trial court's decision to award the plaintiff attorney's fees was legally and logically correct: most of the defendants' claims were not reviewable because the record was inadequate for review, or the claim was not preserved or adequately briefed or was inappropriate, as this court does not, sua sponte, look for reasons to reverse the judgment of the trial court, the record supported the findings of the referee and the trial court that the defendants are indebted to the plaintiff and that they exhibited bad faith throughout the litigation, and this was the rare case in which the arguments put forth were so preposterous, audacious and transparent, and the attempt to avoid payment so obvious, that a finding of bad faith was compelled; moreover, the referee acted well within his authority to find by a preponderance of the evidence that the defendants were untruthful, as credibility determinations are to be made by the finder of fact, who may accept all, some, or none of the testimony of a witness, and the defendants having testified that they were uncertain of the child's parentage despite the overwhelming contrary circumstantial evidence, their behavior in predicating their defense on such a denial was deeply offensive to the norms of civil society.

Argued February 4—officially released May 21, 2019

*Procedural History*

Action to collect a debt, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the matter was referred to an attorney trial referee, who filed a finding of facts and recommended judgment for the plaintiff; thereafter, the trial court, *A. William Mottolese*, judge trial referee, rendered judgment for the plaintiff; subsequently, the attorney trial referee filed a supplemental memorandum of decision; thereafter, the court granted the plaintiff's motions for a special finding of bad faith and for attorney's fees and awarded the plaintiff attorney's fees, and the defendants appealed to this court. *Affirmed.*

*Chaim T. Schwartz*, self-represented, with whom, on the brief, was *Rena E. Gelb*, self-represented, the appellants (defendants).

*Vimala Ruszkowski*, with whom, on the brief, were *Eric J. Stockman* and *Simon I. Allentuch*, for the appellee (plaintiff).

*Opinion*

LAVINE, J. This appeal arises from the defendant parents' refusal to pay for medical care and treatment rendered to their minor child by the plaintiff hospital and the transparently disingenuous machinations they employed in an effort to avoid liability for the debt. We affirm the judgment of the trial court.

The self-represented defendants, Chaim Schwartz and Rena Gelb,[1] appeal from the judgment of the trial court rendered in favor of the plaintiff, Stamford Hospital. On appeal, the defendants have raised twenty-three claims challenging the underlying factual findings of the attorney trial referee (referee)[2] and the legal conclusions of the trial court. In response, the plaintiff argues that there are only two issues relevant to the appeal: were the defendants indebted to the plaintiff and did they exhibit bad faith in defense of the action. We agree with the plaintiff that the judgment should be affirmed.

The following facts, as found by the referee, the court's legal conclusions, and the procedural history are relevant to our resolution of the defendants' appeal. The plaintiff commenced the present action against the defendants on January 21, 2015. In count one of its two count complaint, the plaintiff alleged that, at the request of the defendants, it provided medical services to their minor child from March 5 to March 6, 2013. The child resided in the defendants' home, and, therefore, pursuant to General Statutes § 46b-37 (b),[3] the defendants are liable for the cost of the medical services rendered by the plaintiff. The plaintiff billed the defendants for the services it provided to the child, the reasonable value of which was $14,051.99. Despite having made demand on the defendants for payment, a balance of $8076.25 remained due and owing, which the defendants have refused to pay.[4] In count two, the plaintiff realleged the allegations of count one and that Gelb had signed a patient authorization and agreement (authorization) in which she agreed to pay the plaintiff for the services it rendered to the child plus the costs of collection, including attorney's fees. Despite having made demand on Gelb, she refused to pay the balance of $8076.25. In its prayer for relief, the plaintiff sought money damages, reasonable attorney's fees and costs, and statutory prejudgment and postjudgment interest. On May 12, 2015, the defendants filed amended answers denying the material allegations of the complaint, including that the defendants were the child's parents, and each pleaded fourteen identical special defenses, including accord and satisfaction.

The parties tried the case to the referee pursuant to General Statutes § 52-549[5] and Practice Book § 23-53.[6] The referee issued a memorandum of decision on October 5, 2016, in which he found the following facts. On March 5, 2014, Gelb took the child to the hospital with

symptoms of a stomach virus and because the child had had a seizure.[7] The child was admitted overnight during which time a series of tests were performed that resulted in costs of which $8076.25 remained due. The defendants contend that they are not responsible for the outstanding medical costs on the basis of theories such as accord and satisfaction, lack of notice, lack of need for the services rendered, fair and reasonable value of the services rendered, lack of disclosure of the risks and costs, and the parental liability for the costs of care for a minor child.

The referee found the testimony of the plaintiff's witnesses to be overwhelming with detail regarding the services rendered and their cost, including the medical and insurance review of the costs assessed to the defendants. According to Letitia Borras, a pediatrician, the medical treatment provided was necessary and performed as a standard course of action given the symptoms with which the child presented. The procedures were reviewed with Gelb, who did not object to them. According to Cecelia Rasines, the plaintiff's billing rates are audited and determined by the defendants' insurer and are compared with rates charged for similar treatment by other medical institutions. Nurse auditors audited the defendants' bill by comparing the billing rates and services rendered to the medical records and found the billing statement was accurate.[8]

The defendants both testified. When counsel for the plaintiff questioned Gelb about her responsibility to pay for the services rendered to her child, Gelb responded that she was not certain that she was the child's biological mother because, although she had given birth, she was not with the child constantly throughout her maternity stay. She, therefore, could not confirm that the child she took home was, in fact, the child to whom she had given birth. Thereafter, the referee questioned Gelb whether her prior testimony regarding her uncertainty as to whether she was the child's biological mother was truthful. The referee found that "Gelb admitted lying on the witness stand and committing perjury, stating that the minor child is in fact her biological child and that she only testified of her uncertainty as a method of assisting both of the defendants against the plaintiff's claims."

As to the child's medical care, Gelb testified that she had not consented to certain procedures before they were performed, but she admitted that the child's pediatrician explained the procedures to her, including the need for a computerized axial tomography scan given the child's seizures. Gelb agreed to the plan and signed an authorization for the medical procedures and agreed to be responsible for costs not paid by insurance. Gelb claimed that she signed the authorization while she was under duress in the plaintiff's emergency department. The plaintiff placed into evidence documents Gelb had

signed for the services rendered to the child in the present matter and for the maternity services the plaintiff had provided to her when her children were born. Gelb admitted to having signed each of the documents that evidenced her acceptance of responsibility for the child.[9]

Following some initial equivocation, Schwartz too admitted that he is the child's biological father and that he had no reason to believe that the child is not his. He recognized his responsibility to pay for the costs associated with the medical services provided to the child. Schwartz personally had applied for the insurance plan that was used to pay the plaintiff. He admitted that he was responsible for paying the insurance deductible and that he was aware of the amount of the deductible.

The defendants did not pay for the medical services rendered to the child because they claimed the services were not necessary. They sent a letter to the plaintiff disputing its bill and to the state Department of Public Health (department). Schwartz received a telephone call from someone at the department advising him that the department had performed a full investigation and " 'everything was found to be [okay].' " According to Schwartz, the present case was not the first billing dispute in which he has been involved. In other instances in which he did not pay, the matter remained in collection for a period of time, and then the business "simply [wrote] it off." He did not think that the present matter would result in litigation.

With respect to their special defense of accord and satisfaction, the defendants put three documents into evidence. The documents demonstrate that they had paid $112.48 toward the outstanding balance they owed the plaintiff. They sent the plaintiff a correspondence with the payment, stating that the amount was in full satisfaction of the outstanding balance. The defendants argued that by accepting the payment, the plaintiff forgave the remaining balance due under the law of accord and satisfaction.

The referee set out the relevant provisions of General Statutes § 42a-3-311 titled "Accord and satisfaction by use of instrument"[10] and analyzed the evidence. The plaintiff's billing statement indicated that payments were to be mailed to P.O. Box 120048, Stamford, and that correspondence regarding financial options was to be mailed to P.O. Box 9317, Stamford. The defendants mailed both their payment and correspondence regarding accord and satisfaction to the payment address at P.O. Box 120048. Rasines explained that payments mailed to P.O. Box 120048 do not go to the plaintiff, but, instead, go to a lock box at a Wells Fargo bank. None of the plaintiff's personnel, therefore, would have seen the payment or the defendants' correspondence. Furthermore, on May 12, 2015, more than ninety days

after they had filed their original answers and special defenses, the defendants amended their answers and added special defenses of accord and satisfaction. According to Schwartz, the defendants purposely waited more than ninety days before amending their answers to include the accord and satisfaction special defenses, presumably to avoid giving the plaintiff notice of the defense and an opportunity to conform to § 42a-3-311 (c) (2).[11]

On the basis of his factual findings, the referee concluded that the plaintiff had established that there was no legitimate basis for the defendants to fail to pay the plaintiff the balance of the moneys owed for the services rendered to the child. The referee recognized that the trier of fact may accept or deny all or part of any testimony from a witness. He found that Gelb's perjured testimony and her subsequent admission of the same, degraded her testimony. The referee was "strained to accept any testimony provided by either defendant as truthful," as both of the defendants admitted to lies and deceitful actions under the guise of trial strategy or their lack of knowledge of trial procedure. As to the defendants' claim regarding the legitimacy and necessity of the medical services rendered to the child, the referee found that the defendants had failed to produce any admissible evidence that contradicted the plaintiff's evidence. The referee, therefore, found the defendants' defenses to be disingenuous.

According to the referee, the defendants also failed to establish the requirements of accord and satisfaction under § 42a-3-311. The ninety day requirement of § 42a-3-311 (c) (2) passed only by virtue of the defendants' purposefully deceitful tactics during the pleading stage of the litigation, and the defendants were perhaps calculated when they made the payment itself. The plaintiff's billing statement set forth two distinct addresses to be used for payments and communications. Because the defendants failed to send their communication to the proper address, the plaintiff never received the alleged accord and satisfaction notice. The referee found that the plaintiff had established that, under § 46b-37 (b), no legitimate basis existed for the defendants' failure to pay the moneys they owed the plaintiff.

The referee considered the plaintiff's request for statutory prejudgment and postjudgment interest. General Statutes § 37-3a (b) provides: "In the case of debt arising out of services provided at a hospital, prejudgment and postjudgment interest shall be no more than five percent per year. The awarding of interest in such cases is discretionary." The plaintiff provided the defendants with a billing statement dated June 19, 2014, in the amount of $8076.25, and the defendants paid only $112.48 of that amount. A net balance of $7963.77 remains due and owing the plaintiff. Pursuant to § 37-3a (b), the balance of $7963.77 is subject to statutory

prejudgment and postjudgment interest from June 19, 2014, until the balance is paid in full at a rate of 5 percent per year. The referee reserved the plaintiff's request for attorney's fees and costs to be heard by the trial court after a judgment was rendered on the substantive issue.

The defendants filed an objection to the referee's memorandum of decision, to which the plaintiff responded. The trial court held a hearing on the defendants' objection on January 4, 2017, and issued a memorandum of decision on January 19, 2017.

The court first addressed the defendants' challenge to the referee's jurisdiction. The defendants argued that when they incurred the debt, it was indefinite as to amount because neither defendant knew the cost of the plaintiff's services, and, therefore, the referee lacked jurisdiction to render a decision. The plaintiff countered that neither § 52-549n nor Practice Book § 23-58 requires a definite amount be included within the agreement between the parties; all that is necessary is that the complaint seek a definite sum on the basis of the agreement.

The court explained that referees have jurisdiction over claims for unpaid hospital services. Section 52-549n confers jurisdiction to referees to act in a contract action when the Superior Court refers the matter to the referee pursuant to certain statutory criteria. A claim may be referred to a referee if the claim is predicated on a sum of money that is "capable of reduction to certainty." (Internal quotation marks omitted.) *Housing Authority* v. *Melvin*, 12 Conn. App. 711, 715, 533 A.2d 1231 (1987), cert. denied, 207 Conn. 804, 540 A.2d 74 (1988).

The court recognized that our Supreme Court has acknowledged the special nature of a contract between a medical provider and the parents of a minor child. "[W]hen a medical service provider renders necessary medical care to an injured minor, two contracts arise: the primary contract between the provider and the minor's parents; and an implied in law contract, between the provider and the minor himself. The primary contract between the provider and the parents is based on the parents' duty to pay for their children's necessary expenses, under both common law and statute. Such contracts, where not express, may be implied in fact and generally arise both from the parties' conduct and their reasonable expectations." (Footnotes omitted.) *Yale Diagnostic Radiology* v. *Estate of Fountain*, 267 Conn. 351, 359, 838 A.2d 179 (2004). The court, therefore, concluded that the referee had jurisdiction to adjudicate the present case.

The court noted the law controlling its review of the referee's decision. "Attorney [fact finders] are empowered to hear and decide issues of fact." (Internal quota-

tion marks omitted.) *Beucler* v. *Lloyd*, 83 Conn. App. 731, 735, 851 A.2d 358 (2004), appeal dismissed, 273 Conn. 475, 870 A.2d 468 (2005). In a contract action, findings of fact should be overturned only when they are clearly erroneous. See *Pomarico* v. *Gary Construction, Inc.*, 5 Conn. App. 106, 112, 497 A.2d 70, cert. denied, 197 Conn. 816, 499 A.2d 1336 (1985). The court reviewed the record and found that the referee's numerous findings of fact were amply supported by the evidence and were not clearly erroneous, and that the principles of law that the referee applied to those facts were legally and logically correct.

As to credibility, the court noted the referee's findings with respect to the testimony of the witnesses and that the referee was strained to accept any testimony from the defendants as truthful. The court recognized that a finder of fact is the sole arbiter of the credibility of witnesses and the weight to afford their testimony. See, e.g., *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 462, 844 A.2d 836 (2004).

The court observed the defendants' exceptional acumen in researching the law and fashioning legal arguments, but found that they had "overlooked" Connecticut's presumption of legitimacy rule, which provides that a child born in wedlock is presumed to be the issue of the mother and her husband. See *Weidenbacher* v. *Duclos*, 234 Conn. 51, 63, 661 A.2d 988 (1995). Through their testimony, the defendants impermissibly had attempted to shift the burden of proof of the child's parentage to the plaintiff. The court, therefore, concluded that the referee had ample grounds to disbelieve the defendants' testimony.

Turning to the defendants' special defenses of accord and satisfaction, the court concluded that the referee correctly determined that the defendants' tender of a check in the amount of $112.48 accompanied by a correspondence stating that it was payment in full satisfaction of the plaintiff's invoice of $8076.25 was not an accord and satisfaction for two reasons. First, the defendants intentionally sent the check and correspondence to an address that the plaintiff's billing statement specified was for payment, rather than to an address specified for correspondence. As a result, the plaintiff's personnel never saw the correspondence. Second, the defendants acted deceitfully when, during the pleading stage of the litigation, they waited more than ninety days as specified in § 42a-3-311 (c) (2) to raise the special defense of accord and satisfaction in their amended answers dated May 11, 2015. See footnote 11 of this opinion.

Given the referee's characterization of the defendants' conduct as deceitful, the court identified additional support for the referee's rejection of the defendants' accord and satisfaction defense. The threshold requirement of § 42a-3-311 is that the tender

of the check must be made in good faith. Uniform Commercial Code comment (4) to the statute states: "Good faith in subsection (a) (i) is defined as not only honesty in fact, but also the observance of reasonable commercial standards and fair dealing." (Internal quotation marks omitted.) General Statutes Annotated § 42a-3-311, comment (4) (West 2009).[12] The amount the defendants tendered, $112.48, represents 1.39 percent of the debt they owed.

The court made the following observations regarding bad faith. In Connecticut bad faith is defined as the absence of good faith.[13] "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, and not prompted by an honest mistake as to one's rights or duties, but by some interest or sinister motive. . . . Bad faith means more than mere negligence, it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) *Habetz* v. *Condon*, 224 Conn. 231, 237, 618 A.2d 501 (1992). "It is the burden of the party asserting the lack of good faith to establish its existence and whether that burden has been satisfied in a particular case is a question of fact." (Internal quotation marks omitted.) *Kronberg Bros., Inc.* v. *Steele*, 72 Conn. App. 53, 63, 804 A.2d 239, cert. denied, 262 Conn. 912, 810 A.2d 277 (2002). "Courts do not generally find contracts unconscionable where the parties are businesspersons." *Emlee Equipment Leasing Corp.* v. *Waterbury Transmission, Inc.*, 31 Conn. App. 455, 464, 626 A.2d 307 (1993).

In the present case, the court stated that both of the defendants hold graduate business degrees and are commercially sophisticated. Regardless of the definition of bad faith, the court found that the defendants acted in bad faith in tendering $112.48 to the plaintiff and, therefore, are not entitled to the benefit of accord and satisfaction conferred by § 42a-3-311.

The court next addressed the defendants' claim that the authorization was invalid because it was an "unenforceable adhesion contract." The court again noted the controlling legal principle. The question of unconscionability is one of law to be decided by the court on the basis of all the facts and circumstances. *Iamartino* v. *Avallone*, 2 Conn. App. 119, 125, 477 A.2d 124, cert. denied, 194 Conn. 802, 478 A.2d 1025 (1984). The court noted that "[t]he most salient feature [of adhesion contracts] is that they are not subject to the normal bargaining process of ordinary contracts, and that they tend to involve a standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms . . . ." (Internal quotation marks omitted.) *Reardon* v. *Windswept Farm, LLC*, 280 Conn. 153, 162–63, 905 A.2d 1156 (2006). The classic definition of an uncon-

scionable contract is one which no person not under delusion would make, and which no fair and honest person would accept. *Smith* v. *Mitsubishe Motors Credit of America, Inc.*, 247 Conn. 343, 349, 721 A.2d 1187 (1998). This definition is divided "into two aspects of unconscionability, one procedural and the other substantive, the first intended to prevent unfair surprise and the other intended to prevent oppression." Id.

The court explained that in Connecticut, the amount that a hospital may bill for a particular service is controlled by the "pricemaster," citing to chapters 368z and 368aa of the General Statutes. The rates that the plaintiff may have charged the defendants for the services rendered to their child were, thus, available for public inspection. General Statutes § 19a-681 (c) imposes a severe penalty on a hospital for deviation from the "pricemaster." The court concluded that, although it is arguable whether the authorization Gelb signed is procedurally unconscionable, the element of unfair surprise was not present because the pricemaster was publicly available. The pricemaster rates are based on a national database, and there are severe consequences for a hospital if it exceeds those rates. The defendants offered no evidence of comparable rates for the same services rendered at other hospitals. The court concluded, therefore, that there was no basis on which to find that the authorization was substantively unconscionable.

With respect to Schwartz' special defense that he was not a signatory to the authorization, the court next determined that Schwartz was liable under the authorization pursuant to § 46b-37, regardless of whether he signed the authorization. Section 46b-37 provides in relevant part: "(b) Notwithstanding the provisions of subsection (a) of this section, it shall be the joint duty of each spouse to support his or her family, and both shall be liable for: (1) The reasonable and necessary services of a physician or dentist; (2) hospital expenses rendered the husband or wife or minor child while residing in the family of his or her parents . . . ." Accordingly, the court found that the plaintiff had proved that the defendants had breached the authorization as alleged in count two of the complaint.

In summary, the court stated that it had addressed the remainder of the defendants' fourteen special defenses implicitly in its foregoing analysis or the defenses were otherwise unmeritorious. It rendered judgment in favor of the plaintiff in the amount of $7963.77. The court thereafter found that it was fair and equitable to award the plaintiff prejudgment and postjudgment interest at the rate of 5 percent from June 19, 2014, the date the plaintiff provided the defendants with a billing statement.

With respect to attorney's fees, the court issued an order permitting the plaintiff to file an itemized affidavit

of attorney's fees and the defendants to object, if they wished. Thereafter, the plaintiff filed a motion for a special finding that the denials and defenses pleaded by the defendants were without merit and not brought or asserted in good faith. See General Statutes § 52-226 (a). It also filed a motion for double costs and reasonable counsel fees pursuant to General Statutes § 52-245[14] and a motion for attorney's fees on the basis of the defendants' bad faith. It submitted the affidavit of Vimala B. Ruszkowski, its trial counsel, attesting to attorney's fees of $34,082.20 and costs of $2059.64. The defendants objected to each of the plaintiff's motions and request for attorney's fees.

The court responded to the plaintiff's motion seeking a finding of bad faith, on April 13, 2017, stating that it had found bad faith as a matter of law in its decision regarding the defendants' special defenses of accord and satisfaction, and remanded the case to the referee for a finding of whether any other acts of either or both defendants were made in bad faith and, if so, to identify those acts with particularity.[15] On May 30, 2017, the referee submitted a supplemental memorandum of decision.

The referee identified the special defenses asserted by the defendants and found that all of them were pleaded in bad faith. The referee iterated his findings regarding the defendants' credibility, which alone gave rise to an overall finding of bad faith. Nonetheless, the referee found that specific evidence of bad faith regarding the special defenses was more than abundant at trial so as to affirm his overall finding.

With respect to special defenses one, three, four, five, seven, nine, ten, and eleven,[16] the referee found that prior to the onset of the litigation, the plaintiff took considerable measures to assist the defendants with their concerns regarding the bill, explaining how medical billing is calculated, and describing state oversight and regulations. The defendants were advised that the department had investigated the matter and found the bill to be accurate. The defendants presented no contrary evidence. The referee, therefore, concluded that the special defenses lacked merit and were not pleaded in good faith.

Special defenses two and six alleged, respectively, that the plaintiff's agents rendered one or more unnecessary and/or harmful services to the child for which the defendants should not be billed and that there was no proof that the plaintiff's agents performed the service for which it had billed. The referee found that there was abundant evidence that Gelb met with the child's pediatrician and discussed the treatment being provided. Gelb trusted the child's pediatrician and no physician has ever told Gelb that the care and treatment rendered to the child were unnecessary. Gelb never complained about the treatment prior to receiving the

plaintiff's bill. The defendants, therefore, had no good faith basis to plead special defenses two and six, and as such, the referee found that the defenses were pursued in bad faith.

The referee further found that special defenses twelve, thirteen, and fourteen[17] were raised and pursued without any good faith basis. Both defendants were aware of their financial responsibilities for the child. Gelb identified her signature on the authorization. Schwartz made the arrangements for his family's medical insurance and knew what portion of the bill insurance would pay and what portion he would have to pay. The defendants' testimony was in sharp contrast to the special defenses. The referee, therefore, decided that it was logical to conclude that the defendants had pursued the special defenses in bad faith.

According to the referee, there was no basis for the defendants to defend the plaintiff's claims, and they used the judicial system as a means to avoid, or at least to delay, paying their financial obligation. Schwartz audaciously testified that he never expected the plaintiff to pursue the matter in litigation, because he had avoided financial responsibilities in the past by using similar methods. The defendants went so far as to at least raise doubt about their biological relationship to the child in a failed attempt to avoid their financial responsibility. The referee concluded that such evidence made the determination of bad faith effortless and conclusive.

The defendants objected to the referee's supplemental memorandum of decision. The plaintiff replied, asking the court to overrule the defendants' objection and to order the defendants to pay attorney's fees. The court ruled on the defendants' objection on September 6, 2017, noting the referee's findings that the defendants had acted in bad faith, that they denied being the child's biological parents, and that they lacked credibility.

In adjudicating the plaintiff's § 52-226a motion, the court noted its inherent power to regulate the conduct of litigants whether they are members of the bar; see *State Bar Assn.* v. *Connecticut Bank & Trust Co.*, 145 Conn. 222, 231, 140 A.2d 863 (1958), or laypersons. See *Lederle* v. *Spivey*, 174 Conn. App. 592, 601, 166 A.3d 636, cert. granted on other grounds, 327 Conn. 954, 171 A.3d 1050 (2017). Connecticut courts, however, are to be "solicitous of [self-represented] litigants when it does not interfere with the rights of other parties . . . . [T]he right of self-representation [however] provides no attendant license not to comply with the relevant rules of procedural and substantive law." (Citation omitted; internal quotation marks omitted.) *Macricostas* v. *Kovacs*, 67 Conn. App. 130, 133, 787 A.2d 64 (2001).

Section 52-226a authorizes sanctions for certain con-

duct that offends the court's power to regulate the conduct of litigants. The statute creates an evidentiary dividend, which may be used in subsequent litigation. The court may exercise its power when self-represented litigants are commercially sophisticated as the defendants are in the present case. Gelb has a master of business administration degree from Columbia University and previously worked as a business planner and financial controller. Schwartz has a master of business administration degree from New York University. At the time of trial, he was the vice president for fair lending practices at a major banking institution.

On the basis of the referee's findings and its own independent examination of the record, the court concluded that the deficit in the defendants' credibility permeated the entire proceeding. The court characterized the defendants' testimony as "a study in prevarication, equivocation and obfuscation." (Internal quotation marks omitted.) The primary basis for the court's conclusion was the defendants' denial of parentage of the child.[18]

The court applied the two part bad faith test to determine whether the defendants' conduct constituted bad faith, thereby entitling the plaintiff to attorney's fees. See *Munro* v. *Munoz*, 146 Conn. App. 853, 860–61, 81 A.3d 252 (2013). The court set forth the applicable law. "[T]he trial court is obligated to find *both* that the litigant's claims were entirely without color *and* that the litigant acted in bad faith . . . and the court must set forth its factual findings with a high degree of specificity before awarding attorney's fees." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Lederle* v. *Spivey*, supra, 174 Conn. App. 598 n.2.

"To ensure . . . that fear of an award of [attorney's] fees against them will not deter persons with colorable claims from pursuing those claims, [our Supreme Court has] declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes. . . . and a high degree of specificity in the factual findings of [the] lower courts." (Internal quotation marks omitted.) *Maris* v. *McGrath*, 260 Conn. 834, 845, 850 A.2d 133 (2004).

"[T]he standard for colorability [which] varies depending on whether the claimant is an attorney or a party to the litigation. . . . If the claimant is an attorney, a clam is colorable if a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts had been established. . . . If the claimant is a party to the litigation, a claim is colorable, for purposes of the bad faith exception to the American rule, if a reasonable person, given his or her first hand knowledge of the underlying matter, could have concluded that the facts supporting the

claim might have been established." (Internal quotation marks omitted.) *Lederle* v. *Spivey*, supra, 174 Conn. App. 602.

"To determine whether the bad-faith exception applies, the court must assess whether there has been substantive bad faith as exhibited by, for example, a party's use of oppressive tactics or its wilful violations of court orders; [t]he appropriate focus for the court . . . is the conduct of the party in instigating or maintaining the litigation." (Internal quotation marks omitted.) *Berzins* v. *Berzins*, 306 Conn. 651, 662, 51 A.3d 941 (2012).

With respect to the colorability prong, the court framed the issue as whether "the defendants' conduct in denying the parentage of their child while under oath in order to defeat legitimate claims made by the plaintiff for medical services rendered to their child constitute a colorable defense to the action? The answer depends upon whether a reasonable person, given his or her firsthand knowledge of the underlying matter could have concluded that the facts supporting the claim of nonparentage might have been established." The reasonable person test requires a determination of what "a reasonable person of honest intentions would know or believe under the facts of the case." *State* v. *Lenczyk*, 1 Conn. App. 270, 271, 470 A.2d 1240 (1984).

Because the defendants were the biological parents of the child, the court found that there was "no one in the world who could or would have known the underlying facts of parentage better than [they]." No reasonable person acting with honest intentions could have concluded that the child was not the defendants' child. The defendants acted with a dishonest purpose when they denied paragraph 2 of count one of the complaint, which alleged that they were the child's parents. Their denial is even more "poignant" when it is viewed in the context of the common-law presumption of legitimacy that provides that a child born in wedlock is presumed to be the issue of the mother and her husband. See *Weidenbacher* v. *Duclos*, supra, 234 Conn. 63. Coupled with the presumption of legitimacy, § 46b-37 imposes statutory liability on the defendants for the necessary and reasonable medical services rendered to their child.

Connecticut courts historically have imposed sanctions on parties for untruthful pleading. A plea of general denial to material allegations of the complaint that the defendant knew to be true subjects a litigant to pay expenses incurred to establish the truth. See *Hatch* v. *Thompson*, 67 Conn. 74, 76, 34 A. 770 (1895). In *Jennings Co.* v. *DiGenova*, 107 Conn. 491, 494, 141 A. 866 (1928), our Supreme Court held that the defendant should have been charged with the plaintiff's reasonable expenses for untruthfully pleading "denial of a fact without reasonable cause." The rules of practice similarly address the subject. See Practice Book §§ 4-2 (b) and

10-5.[19]

The court found that the defendants' disavowal of their previous acknowledgement of the child's parentage to avoid a debt is counter to the accepted norms of a civilized world. The court noted that in a termination of parental rights case instituted by a child's father, our Supreme Court denounced the practice, stating: "It would be anathema for our law to allow parents to terminate voluntarily their parental rights solely for the purpose of evading or relieving [themselves] of responsibility to pay child support." (Internal quotation marks omitted.) *In re Bruce R.*, 234 Conn. 194, 200, 662 A.2d 107 (1995). The trial court found that in the present case, the defendants had used the child's parentage as a way to avoid paying a legitimate charge for medical services rendered to the child for which they were legally obligated. The court thus concluded that the defendants' denial of parentage and the defense made at trial were without color because they constituted an oppressive tactic and were designed to achieve a dishonest purpose. The court determined that its finding was supported by clear evidence. See *Wildwood Associates*, *Ltd.* v. *Esposito*, 211 Conn. 36, 42 n.3, 557 A.2d 1241 (1989) (clear evidence same substantive standard as clear and convincing proof).

The trial court stated that, under § 52-226a,[20] a court need find only a single defense to be without merit and not asserted in good faith before the finding may be admitted in a vexatious defense case under General Statutes § 52-568.[21] The referee found that multiple defenses asserted by the defendants fell into the bad faith category. The defendants argued that a defense is not asserted in bad faith and is colorable if it had been believed or were believable. The court rejected the argument.

By way of contrast, the court noted the defendants' first special defenses that the plaintiff's bill was unreasonably high, which reflected a mental state that is not uncommon to the average patient who receives a multipage, itemized bill with a surprisingly high total. The first special defense, therefore, was colorable. The defendants, however, failed to prove their defense that the plaintiff's charges were unreasonable. Reasonableness is a question of fact for the trier of fact. The court found that the plaintiff proved the reasonableness of its bill. See *Andrews* v. *Gorby*, 237 Conn. 12, 23, 675 A.2d 449 (1996) (reasonableness of compensation requested proved by preponderance of evidence).

In their second special defenses, the defendants pleaded that the services rendered by the plaintiff were unnecessary and/or harmful. The court concluded that there was no basis for the defendants to have pleaded such a special defense because there were no facts to support it.

In their fourth special defenses, the defendants pleaded that the plaintiff provided false or misleading information. The court found no facts to support the pleading or credible evidence to support the defendants' claim.

The defendants' fifth special defenses alleged that the plaintiff failed to disclose the amount it would charge for the services rendered to the child. Other than the statutory obligation to post its charges pursuant to § 19a-681 (a) as a "pricemaster" where it is available for public inspection at the Office of Health Care Access, the plaintiff was under no statutory or common-law duty to advise the defendants in advance of the amount of its charges. Under the circumstances, the court found that there was no way that nondisclosure of unit prices or a lack of informed consent to the charges had any basis in fact and, therefore, could not have been established.

The court found the sixth special defenses, which alleged that the plaintiff had no proof that it performed the services for which it billed to the defendants, to be altogether implausible. Gelb testified that after the services were performed, she discussed the very services with the child's pediatrician, who reassured her that such services were appropriate under the circumstances. The defendants knew full well before the litigation began that the services billed had been rendered. The court concluded that such a defense would have been effective if it were true, but that in the present case it had no basis in fact and was not colorable.

The seventh special defenses asserted that the services rendered by the plaintiff could not be identified because the bill was "not written in plain English." The court found no factual support for such a defense, and the defendants presented no evidence of a statutory or regulatory requirement to that effect. Section 19a-681 governs the posting of hospital charges.[22] The plaintiff's billing statement identifies each service performed in language that an ordinary person with no medical training can understand. The court found it inconceivable given the extent of the defendants' formal educations that they were unable to identify the services rendered. The defense, therefore, was frivolous and without color.

The court previously had addressed the special defenses of accord and satisfaction but added that it is a well recognized defense. The defendants' use of it, however, solely as an artifice of avoidance, was deceitful and without color when considered with the defendants' other mertiless defenses.

The twelfth special defenses alleged that Gelb had never received a bill for the services the plaintiff rendered to the child. The court found the special defense to be a falsehood. The defendants testified that they not only received the bill but also took affirmative action

calculated to avoid paying all but a miniscule amount of the debt. The falsehood was perpetrated for no other purpose than to avoid paying the bill. The defense, therefore, was without color.

With regard to the defendants' fourteenth special defenses that Schwartz did not sign the authorization and, therefore, could not be held liable, the court concluded that it lacked any indicia of color. In view of the defendants' extraordinarily thorough research, the court found it incredible that they missed the most basic principle governing a parent's financial responsibility for a child. Section 46b-37 (2) imposes a legal obligation on a parent of a minor child while the child is residing in the family of its parents. See *Yale Diagnostic Radiology* v. *Estate of Fountain*, supra, 267 Conn. 361. Consequently, it is immaterial to Schwartz' liability whether he signed the authorization. Gelb testified that she recognized her responsibility to pay for the medical services rendered to the child because she is the child's parent. This defense becomes disingenuous when Schwartz asserts that he has no concomitant responsibility.

Having concluded that the referee's findings as to whether the defendants' special defenses were colorable were amply supported by the evidence, the court moved to the second prong of the test set out in *Maris* v. *McGrath*, supra, 269 Conn. 845, i.e., whether the defendants acted in bad faith.

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382 (2004). The definition of bad faith in *Maris* is somewhat different: "To determine whether the bad faith exception applies, the court must assess whether there has been substantive bad faith as exhibited by, for example, a party's use of oppressive tactics or its wilful violations or court orders; [t]he appropriate focus for the court . . . is the conduct of the party in instigating or maintaining the litigation." (Internal quotation marks omitted.) *Maris* v. *McGrath*, supra, 269 Conn. 847. In cases involving debt collection avoidance, a bankruptcy court looks to the totality of the circumstances and may consider a wide range of factors, including "the nature of the debt . . . the timing of the [bankruptcy] petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the

bankruptcy court and the creditors." (Internal quotation marks omitted.) *In re Meyers*, 491 F.3d 120, 152 (3d Cir. 2007). The court determined that most of the factors applied to the defendants.

The court concluded that, under any definition, the defendants had acted in bad faith. Under the *De La Concha of Hartford, Inc.*, definition, the defendants' refusal to fulfill their contractual obligation was not prompted by an honest mistake as to their rights or duties. Rather, they carefully contrived a scheme prompted by the dishonest purpose to avoid a financial obligation by lying under oath and asserting defenses that bear no indicia of color. The court agreed with the referee that the "defendants' prevarications and obfuscation permeated the entire trial and infiltrated their pleadings." The court, therefore, specifically found that the special defenses identified in its memorandum of decision were without merit and that they were not prompted by an honest mistake as to either the defendants' rights or duties.

The court turned to the plaintiff's request for attorney's fees. The defendants argued that the total attorney's fees that may be awarded to the plaintiff could not exceed 15 percent of the judgment pursuant to General Statutes § 42-150aa (b).[23] The court disagreed, concluding that the plaintiff's claim was not limited by statute, but was controlled by the common-law rule that the court may award attorney's fees for bad faith. The court reasoned that whenever there is an attorney's fee provision in a consumer party's contract, that provision is subject to § 42-150aa unless it is coupled with a distinctly different cause of action such as a breach of contract claim. A rule of statutory construction provides that "[n]o statute is to be construed as altering the common law, farther than its words import [and . . . a statute] is not to be construed as making any innovation upon the common law which it does not fairly express." (Internal quotation marks omitted.) *State* v. *Luzietti*, 230 Conn. 427 433, 646 A.2d 85 (1994).

In *Rizzo Pool Co.* v. *Del Grosso*, 240 Conn. 58, 69–72, 689 A.2d 1097 (1997), our Supreme Court construed the scope of General Statutes § 42-150bb,[24] the sister statute of § 42-150aa, in determining that the statute did not limit a successful defendant in a consumer contract case to the 15 percent allowed in § 42-150aa. The court looked to the plain language of the statute and was persuaded that the phrase " 'the terms governing the size of the fee for the commercial party,' relates to the parties' contract, and not to § 42-150aa. Had the legislature intended to limit consumer awards of attorney's fees to 15 percent, it would have incorporated the provisions of § 42-150aa by expressly providing 'as provided in § 42-150aa.' Moreover, reading § 42-150bb in context, as we must, it is clear that the phrase, 'the terms governing the size of the fee for the commercial

party,' relates to 'the contract or lease' as provided in the immediately preceding sentence in the statute." Id., 74.

The court in the present case, relying on its discussion of *Rizzo*, stated "from the language of subsection (b) of § 42-150aa, it is clear that the fee limitation was intended to apply to a consumer contract, which by our decisional law is imported into that contract, and not to bad faith conduct of a party which is an actionable wrong [that] exists independently of the contract." The court, therefore, concluded that it was free to award attorney's fees for bad faith conduct independent of the authorization and that it had a proper basis for extending the award to Schwartz.

The plaintiff's counsel filed an affidavit for attorney's fees seeking a total of $34,082.20. The affidavit is itemized, identifies each attorney who performed a service, provides the attorney's respective hourly rate, describes the service, and assigns a time factor in hours and minutes, and the corresponding cost. The hourly rate for each attorney ranged from $175 to $265 per hour, with most entries at $185. The defendants objected to the fees on several grounds.

Schwartz disclaimed liability because (1) he was not contractually obligated to pay and (2) there is no statute that requires a spouse to pay another spouse's attorney's fees. The court referred to its prior explanation as to why Schwartz is responsible to pay for the child's medical care pursuant to the authorization signed by Gelb. As to the second reason, the court found it to be an attempt to distinguish Schwartz' statutory liability for the child's medical care from interspousal liability for attorney's fees for which there is no liability in the present context. The court found the argument to be disingenuous, as it purposefully overlooks parental responsibility fixed by statute.

The defendants also challenged the reasonableness of the attorney's fees requested. The court held an evidentiary hearing to permit the defendants to cross-examine the plaintiff's counsel and to offer evidence of their own that the attorney's fees were unreasonable. The defendants claimed that the attorney's fees exceeded the amount prayed for in the complaint, i.e., $15,000. The court explained that the plaintiff's classification of the case in its complaint as seeking less than $15,000 is designed for administrative purposes only and does not limit the amount of damages that can be recovered. See *Southington '84 Associates* v. *Silver Dollar Stores, Inc.*, 237 Conn. 758, 765, 678 A.2d 968 (1996). Moreover, Practice Book § 11-21 treats the award of attorney's fees separately from the complaint.[25] Id., 766.

The defendants also argued that the amount of attorney's fees sought was disproportionate to the amount

in controversy. The court acknowledged that dispropor-
tionality of legal fees is one of the many factors that a
court is required to consider in assessing whether an
attorney's fee is reasonable. See Rules of Professional
Conduct 1.5. Cases discussing the propriety of awarding
disproportionate fees focus on the amount recovered
in comparison to the amount claimed for fees. See, e.g.,
*Simms* v. *Chaisson*, 277 Conn. 319, 332–34, 890 A.2d
548 (2006). In the present case, the plaintiff recovered
the entire amount claimed.

The court found the 241.6 hours of time the plaintiff's
attorneys devoted to the present case to be dispropor-
tionate to the amount recovered by any ordinary assess-
ment. Although the trial itself took less than two days,
there were 248 entries in the docket, which was greatly
disproportionate to the average activity in a similar
case. The defendants complained that the plaintiff was
represented by two attorneys at trial. The court stated
that this was no ordinary collection matter, but one
that was overburdened with "creative" defenses and
objections, as well as excessive pleading, and that the
self-represented defendants transformed a relatively
straightforward collection case into a "pitched legal
battle." See *Rana* v. *Terdjanian*, 136 Conn. App. 99,
117, 46 A.3d 175, cert. denied, 305 Conn. 926, 47 A.3d
886 (2012). The court considered the foregoing factors
in addition to those enumerated in rule 1.5 of the Rules
of Professional Conduct.

"[When determining] reasonableness of requested
attorney's fees . . . more than [a] trial court's mere
general knowledge is required for an award of attorney's
fees. . . . The burden of showing reasonableness rests
on the party requesting the fees, and there is an undis-
puted requirement that the reasonableness of attorney's
fees and costs must be proved by an appropriate eviden-
tiary showing. . . . [T]here must be a clearly stated
and described factual predicate for the fees sought,
apart from the trial court's general knowledge of what
constitutes a reasonable fee. . . . That factual predi-
cate must include a statement of the fees requested and
a description of services rendered." (Internal quotation
marks omitted.) *Gagne* v. *Vaccaro*, 118 Conn. App. 367,
371–72, 984 A.2d 1084 (2009). A party need not present
expert testimony regarding attorney's fees. *William
Raveis Real Estate, Inc.* v. *Zajaczakowski*, 172 Conn.
App. 405, 424, 160 A.3d 363 (2017). The court properly
may rely on a financial affidavit, as well as its own
knowledge and involvement with the trial, to ascertain
reasonable attorney's fees. Id.

The court applied the foregoing guidelines and found
that the hourly rates of the plaintiff's counsel were
reasonable and that the time expended was reasonably
necessary. The court concluded that the plaintiff had
met its burden of providing a factual predicate for the
attorney's fees and awarded it the full amount requested

against both defendants.

The defendants have raised twenty-three claims on appeal. On the basis of our thorough review of the record, we conclude that none of the claims is meritorious and most of them are not reviewable, as the record is inadequate for review, or the claim was not preserved or adequately briefed, or is inappropriate as this court does not, sua sponte, look for reasons to reverse the judgment of the trial court.

In conducting our examination of the record and the memoranda of decision written by the referee and trial court, we are mindful of the applicable legal principles and standards of review. "A reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is the Supreme Court . . . the Appellate Court . . . or the Superior Court reviewing the findings of the . . . attorney trial referees. . . . This court has articulated that attorney trial referees and [fact finders] share the same function . . . whose determination of the facts is reviewable in accordance with well established procedures prior to the rendition of judgment by the court. . . .

"The factual findings of a[n] [attorney trial referee] on any issue are reversible only if they are clearly erroneous. . . . [A reviewing court] cannot retry the facts or pass upon the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *LPP Mortgage, Ltd.* v. *Lynch*, 122 Conn. App. 686, 692, 1 A.3d 157 (2010).

"Our standard of review concerning a trial court's findings of fact is well established. If the factual basis of the court's decision is challenged, our review includes determining whether the facts set out in the memorandum of decision are supported by the record or whether, in light of the evidence and pleadings in the whole record, those facts are clearly erroneous. . . . Further, a court's inference of fact is not reversible unless the inference was arrived at unreasonably." (Internal quotation marks omitted.) *Stein* v. *Tong*, 117 Conn. App. 19, 24, 979 A.2d 494 (2009).

"The trial court's legal conclusions are subject to plenary review. [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *Hartford Fire Ins. Co.* v. *Werner*, 91 Conn. App. 685, 687–88, 881 A.2d 1065, cert. denied, 276 Conn. 919, 888 A.2d 88 (2005).

It is well established that appellate courts "review the trial court's decision to award attorney's fees for abuse of discretion. . . . This standard applies to the amount of fees awarded . . . and also to the trial court's determination of the factual predicate justifying the award. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . .

"Connecticut adheres to the American rule, which provides that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. . . . When a contract expressly provides for the recovery of reasonable attorney's fees, an award under such a clause requires an evidentiary showing of reasonableness. . . . A trial court may rely on its own general knowledge of the trial itself to supply evidence support of an award of attorney's fees. . . . The amount of attorney's fees to be awarded rests in the sound discretion of the trial court and will not be disturbed on appeal unless the trial court has abused its discretion. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law . . . ." (Citation omitted; internal quotation marks omitted.) *LLP Mortgage, Ltd.* v. *Lynch*, supra, 122 Conn. App. 702.

On the basis of our extensive review of the record and examination of the well reasoned memoranda of decision of the referee and trial court, we conclude that the record supports their findings that the defendants are indebted to the plaintiff and that they exhibited bad faith throughout the litigation. This is the rare case in which the arguments put forth are so preposterous, audacious, and transparent, and the attempt to avoid payment so obvious, that a finding of bad faith is compelled. Above all else, credibility determinations are to be made by the finder of fact who may accept all, some, or none of the testimony of a witness. See *Cusano* v. *Lajoie*, 178 Conn. App. 605, 609, 176 A.3d 1228 (2017). The referee acted well within his authority to find by a preponderance of the evidence that the defendants were untruthful. See *Kaczynski* v. *Kaczynski*, 294 Conn. 121, 126, 981 A.2d 1068 (2009) (preponderance of evidence usual standard in civil case). The defendants testified that they were uncertain of the child's parentage despite the overwhelming contrary circumstantial evidence. Their behavior in predicating their defense on such a denial is deeply offensive to the norms of civil society. Accordingly, because the record supports

the findings of the referee and the court that the defendants acted in bad faith, the court's decision to award attorney's fees is legally and logically correct. For the foregoing reasons, the defendants' appeal fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In this opinion, we refer to the defendants individually by their respective surnames and collectively as the defendants, where appropriate.

[2] The referee was Attorney Anthony J. Medico.

[3] General Statutes § 46b-37 (b) provides in relevant part: "[I]t shall be the joint duty of each spouse to support his or her family, and both shall be liable for . . . (2) hospital expenses rendered the husband or wife or minor child while residing in the family of his or her parents . . . ."

[4] The defendants' insurer paid the portion of the bill for which it was responsible.

[5] General Statutes § 52-549n provides in relevant part: "[T]he judges of the Superior Court may make such rules . . . to provide a procedure in accordance with which the court, in its discretion, may refer to a fact-finder for proceedings authorized pursuant to this chapter, any contract action pending in the Superior Court . . . in which only money damages are claimed and which is based on an express or implied promise to pay a definite sum, and in which the amount, legal interest or property in controversy is less than fifty thousand dollars exclusive of interest and costs. . . ."

[6] Practice Book § 23-53 provides in relevant part: "The court, on its own motion, may refer to a fact finder any contract action pending in the Superior Court . . . in which money damages only are claimed, which is based upon an express or implied promise to pay a definite sum, and in which the amount, legal interest or property in controversy is less than $50,000, exclusive of interest and costs. . . ."

[7] The record discloses that the child was transported to the hospital by ambulance.

[8] The child's medical chart was placed into evidence. By letter dated July 3, 2013, Maggie Zurita, a nurse and senior risk associate of the plaintiff, wrote to Schwartz stating in part: "This letter is in response to the concerns you outline in your letter of May 5, 2013 to the Accounts Receivable Department. . . .

"The care and treatment of your [child] has been reviewed by the Chair of Emergency Medicine, Chair of Pediatrics and the Director of Maternal Child Health. . . .

"In your case, our investigation shows that your bill was calculated correctly and in accordance with the contract you have with your insurance provider. The amount on your bill is the amount for which you are responsible for the service(s) or procedure(s) you received, and reflects discounts your insurance provider has negotiated with us."

[9] The authorization provided in relevant part: "4. FINANCIAL AGREEMENT: The undersigned agrees, whether he/she signs as patient or as legal representative, that in consideration of the services to be rendered to the patient, he/she hereby individually obligates himself/herself to pay the account of the Hospital and any physician or physician organization providing such services on a fee for service basis to the patient in accordance with the regular rates and terms of the Hospital and any such physician or physician organization. Should the account be referred to an attorney for collection, the undersigned shall pay reasonable attorney's fees and collection expenses. All delinquent accounts bear interest at the legal rate."

Paragraph 4 of the patient authorization and agreement that Gelb signed for the 2009 and 2011 child birth admissions state the same.

[10] General Statutes § 42a-3-311 provides in relevant part: "(a) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

"(b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim. . . ." See footnote 11 of this opinion.

[11] General Statutes § 42a-3-311 (c) provides in relevant part: "Subject to

subsection (d), a claim is not discharged under subsection (b) if either of the following applies . . . (2) The claimant . . . proves that *within ninety days* after payment of the instrument, the claimant tendered repayment of the amount of the instrument to the person against whom the claim is asserted. . . .” (Emphasis added.)

[12] See *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*, 98 Conn. App. 784, 790, 912 A.2d 513 (2006), cert. denied, 281 Conn. 914, 916 A.2d 55 (2007), quoting General Statutes Annotated § 42a-3-311, comment (4) (West 2009); accord *IFC Credit Corp.* v. *Bulk Petroleum Corp.*, 403 F.3d 869, 874 (7th Cir. 2005) (“[o]rdinarily the good faith requirement is violated where there is no bona fide mutual dispute concerning consideration, or *the party tendering the payment affirmatively misleads the claimant*” [emphasis in original]).

[13] See *Habetz* v. *Condon*, 224 Conn. 231, 236–37, 618 A.2d 501 (1992) (standard definition of bad faith is absence of good faith); see also *Kupersmith* v. *Kupersmith*, 146 Conn. App. 79, 98 n.14, 78 A.3d 860 (2013) (same).

[14] The plaintiff contended that it was entitled to reasonable attorney’s fees pursuant to the authorization and § 52-245 for the defendants’ statement that they possessed a bona fide defense to each of the plaintiff’s legal claims, when the statement was made without just cause.

[15] The remand order was issued pursuant to *Maris* v. *McGrath*, 269 Conn. 834, 845, 850 A.2d 133 (2004) (to award attorney’s fees there must be clear evidence that challenged actions are entirely without color and taken for improper purposes), and *Fattibene* v. *Kealey*, 18 Conn. App. 344, 359–60, 558 A.2d 677 (1989) (court’s inherent authority to impose sanction of attorney’s fees for bad faith pleading).

[16] In brief, the special defenses alleged, respectively, that the amount of the bill was unreasonably high, the plaintiff’s agents failed to disclose pertinent information about the services rendered, the plaintiff’s agents provided false or misleading information, prior to rendering services the plaintiff’s agents did not disclose the amount it would charge for those services, the defendants cannot identify all of the services the plaintiff alleges were provided, the authorization is an unconscionable adhesion contract, because the plaintiff failed to disclose the amounts it would charge for the services provided prior to performing them, the court must determine the reasonable value of those services, and a contract requiring one or both defendants to pay in full for services rendered instead of requiring one or both of them to pay the plaintiff a reasonable amount for the services rendered is unconscionable. The referee did not address the special defense of accord and satisfaction, which was decided by the court.

[17] Special defenses twelve, thirteen and fourteen alleged, respectively, that Gelb was never billed for the services rendered and cannot be expected to pay for them, the authorization was not filed in court or provided to the defendants within the timeframe of Practice Book § 10-29 (a) and should not be admitted into evidence, and the plaintiff did not allege that Schwartz signed any contract with it, and, therefore, the second count should be dismissed against him.

[18] The court quoted the following examination of Gelb by the plaintiff’s counsel and the referee that demonstrates Gelb’s denial of parentage, her equivocation, her justification for the denial, her statutory and contractual obligation to pay, and the scheme the defendants developed:

“[The Plaintiff’s Counsel]: Good afternoon, Ms. Gelb. Isn’t it true that you are the mother of [the child]?

“[Gelb]: I don’t know. [The child] is the child that lives with me, but I was not with [the child] all the time in the hospital after I gave birth, so I’m not sure if [the child] is the child I gave birth to.

“[The Plaintiff’s Counsel]: Okay, so you’re stating here under affirmation, that you don’t know whether you’re the mother of [the child]?

“[Gelb]: Correct.

“[The Plaintiff’s Counsel]: You gave birth to [the child], isn’t it true that you gave birth to [the child] at Stamford Hospital in August, 2011?

“[Gelb]: I gave birth to a [child] at Stamford Hospital.

“[The Plaintiff’s Counsel]: If you’re uncertain that [the child] is your child, have you made any efforts to locate a child that could potentially be yours rather than [the child]?

“[Gelb]: No.

\* \* \*

“[The Referee]: Okay. Are you saying you don’t know because you are unaware as to whether the child is the subject matter of this litigation is actually yours?

"[Gelb]: Correct.

"[The Plaintiff's Counsel]: You called [the child] and acknowledge [the child] as that for all other purposes and all other situations, except this litigation. Correct?

"[Gelb]: Correct.

"[The Plaintiff's Counsel]: And you are doing that because you think if you cast some doubt on whether you are the parent of the [child], that will absolve your duty to pay for [the child]. Correct?

"[Gelb]: Correct."

The court then quoted the following examination of Schwartz by the plaintiff's counsel as to his past conduct, his outright denial of paternity, his equivocation, and the reason and justification for his denying that the child is biologically his:

"[Schwartz]: There were other providers that I owed, and I refused to pay them, and they stopped bothering me for collection because I disagreed with them. . . .

"[The Plaintiff's Counsel]: Mr. Schwartz, isn't it true that up until this point you denied knowledge under oath at your deposition and in court papers about whether you're the father of [the child]?

"[Schwartz]: I denied knowledge, but I explicitly stated that I believe that [the child] is [my child]. That I file tax returns claiming [the child] as a dependent, that [the child] is on my birth certificate. *That in all respects, aside from when I am under oath, that I claim that* [*the child is mine*]. . . . And my understanding in doing this, is that I—there is—there's nothing wrong with—ok.

"And my understanding in doing this is that there is a difference in court— and this may be completely wrong because I'm pro se—but in court, the standard is knowledge, not belief. Now that may not be true, and if it's not true, so then it doesn't matter. So then [the child] is [mine] if knowledge is belief. If the—if the standard is knowledge, then—then [the child] is not [mine] or —I'm sorry—[the child is] not—it's not that [the child] is not my [child], I don't know if she is my [child], I never had a paternity test. Now, I also believe, and this may not be true, that it's—OK to cast doubt and to require the opposing party—to prove that [the child] is my [child], if the standard is knowledge.

"[The Plaintiff's Counsel]: Isn't it true that you have absolutely no evidence that would support the notion that [the child] is not your biological [child]?

"[Schwartz]: That's correct."

[19] Practice Book § 4-2 (b) provides in relevant part: "The signing of any pleading . . . shall constitute a certificate that the signer has read such document, that to the best of the signer's knowledge, information and belief there is good ground to support it, that it is not interposed for delay . . . ."

Practice Book § 10-5 provides in relevant part: "Any allegation or denial made without reasonable cause and found untrue shall subject the party pleading the same to the payment of such reasonable expense, to be taxed by the judicial authority, as may have been necessarily incurred by the other party by reason of such untrue pleading . . . ."

[20] General Statutes § 52-226a provides in relevant part: "In any civil action . . . tried to the court, and not more than fourteen days after judgment has been rendered, the prevailing party may file a written motion requesting the court to make a special finding to be incorporated in the judgment or made part of the record . . . that the action or a defense to the action was without merit and not brought or asserted in good faith. Any such finding by the court shall be admissible in any subsequent action brought pursuant to section 52-568."

[21] General Statutes § 52-568 provides in relevant part: "Any person who . . . asserts a defense to any civil action or complaint commenced and prosecuted by another . . . (2) without probably cause, and with a malicious intent unjustly to vex and trouble such other person shall pay him treble damages."

[22] General Statutes § 19a-681, titled "Definitions," provides in relevant part: "(a) For purposes of this section: (1) 'Detailed patient bill' means a patient billing statement that includes, in each line item, the hospital's current pricemaster code, a description of the charge and the billed amount; and (2) 'pricemaster' means a detailed schedule of hospital charges. . . ."

[23] General Statutes § 42-150aa (b) provides: "If a lawsuit in which money damages are claimed is commenced by an attorney who is not a salaried employee of the holder of a contract or lease subject to the provisions of this section, such holder may receive or collect attorney's fees, if not otherwise prohibited by law, or not more than fifteen percent of the amount of any

judgment which is entered."

[24] General Statutes § 42-150bb provides in relevant part: "Whenever any contract . . . entered into . . . to which a consumer is a party, provides for the attorney's fee of the commercial party to be paid by the consumer, an attorney's fee shall be awarded as a matter of law to the consumer who successfully prosecutes or defends an action . . . based upon the contract . . . . Except as hereinafter provided, the size of the attorney's fee awarded to the consumer shall be based as far as practicable upon the terms governing the size of the fee for the commercial party. . . ."

[25] Practice Book § 11-21 provides in relevant part: "Motions for attorney's fees shall be filed with the trial court within thirty days following the date on which the final judgment of the trial court was rendered. . . . Nothing in this section shall be deemed to affect an award of attorneys' fees assessed as a component of damages."

———————————————